K.W. MUTH CO., and Muth Mirror Systems, L.L.C., Plaintiffs,

v.

BING–LEAR MFG. GROUP, L.L.C., and SLI, Inc., Defendants.

No. 01–71925.

United States District Court, E.D. Michigan, Southern Division.

Sept. 19, 2003.

**556**

Casandra L. Thomson, Latham & Watkins, Max Grant, Latham & Watkins, Chicago, IL, Edward C. Cutlip, Jr., Kerr, Russell, (Detroit), Detroit, MI, for Plaintiffs.

*ORDER GRANTING IN PART PLAINTIFFS' RENEWED MOTION TO COMPEL*

PEPE, United States Magistrate Judge.

Parties are involved in a complex patent dispute involving two patents—the '724 and '746 patents—related to turn signal mirrors. The fact discovery deadlines have passed and trial is set for November 2003. Plaintiffs have filed a renewed motion to compel and for evidentiary sanctions concerning the scope of a waiver of attorney client and work product matters resulting from Defendant Bing–Lear Manufacturing Group, LLC's reliance on an advice of counsel defense to Plaintiffs' claim of willful infringement.[1] For reasons noted below, Plaintiffs should be allowed further discovery on this limited issue.

■ As in most patent cases, one of the major issues is whether Defendant has or is *willfully* infringing either or both of Plaintiffs' '724 and '746 patents and faces up to treble damages and attorney fees.[2] While willful infringement is determined under the totality of the circumstances test, one of the more important factors is whether the alleged infringer obtained a competent opinion from counsel. *See Comark Communications, Inc. v. Harris Corp.,* 156 F.3d 1182, 1190 (Fed.Cir.1998) ("In determining whether willfulness has been shown, we look to the totality of the circumstances, understanding that willfulness, as in life, is not an all-or-nothing trait, but one of degree. It recognizes that infringement may range from unknowing, or accidental, to deliberate, or reckless, disregard of the patentee's legal rights."

*S.A. v. Cooper Life Scis.,* 34 F.3d 1048, 1056, 32 U.S.P.Q.2d 1017 (Fed.Cir.1994); *see also Read Corp. v. Portec, Inc.,* 970 F.2d 816, 829, 23 U.S.P.Q.2d 1426 (Fed.Cir.1992) (reversing a finding of willfulness and finding that "[n]o reasonable juror could find the asserted proof of willfulness rose to the quantum of clear and convincing evidence"). A defendant, if found to have violated a valid patent, may assert as a defense to the enhanced damages under 35 U.S.C. Section 284 a claim that it relied on advice of counsel regarding infringement, construction, scope, validity and/or enforceability of the patents at issue. *Therma–Tru Corp. v. Peachtree Doors, Inc.,* 44 F.3d 988, 997 [33 USPQ2d 1274] (Fed.Cir.1995).

---

1. On or about September 9, 2002, Defendant SLI filed for Chapter 11 bankruptcy. SLI's filing acts as an automatic stay of any further action by the Court against SLI. *See* 11 U.S.C. § 362(a). Thus only Defendant, Bing–Lear is actively litigating.

2. 35 U.S.C. Section 284 permits that damages be increased "up to three times the amount found or assessed" if there is a finding of willful infringement. Under the Federal Circuit's standard, a patent holder proves willfulness by presenting "clear and convincing evidence" that the infringer acted in disregard of the patent and had no reasonable basis for believing it had a right to engage in the infringing acts. *Electro Med. Sys.,*

(internal quotation marks omitted)).[3] In the present case, Defendant is relying on written advice of prior counsel that its turn signal mirror does not infringe Plaintiff's '724 patent and wishes to retain the option of relying on the oral advice of litigation counsel that the accused product does not violate Plaintiff's '746 patent which accusation came in August 2001 with Plaintiffs' Second Amended Complaint. The major dilemmas presented in such cases result from the trial risks of a negative inference resulting from not producing some advice of counsel as a defense to a claim of willful infringement.[4]

This dispute involves major dilemmas in patent litigation involving the choice of counsel, the seeking of pre-litigation advice of counsel, and the assertion of that advice as a defense to any claim of willful infringement. The dilemma regarding the '746 patent which first surfaced after litigation began involves the extent to which a business person must forego the efficiencies of having a single attorney give an opinion and also serve as litigation counsel. Business people commonly form longstanding and good working relations with a particular patent counsel whom becomes greatly trusted. From a legal and policy view, courts should encourage business people to get opinions on the scope and limits [and/or validity] of other companies' patents.[5] Increasing the cost of this relationship by heightening the likelihood that two sets of attorneys will be required if litigation results—and possibly losing the attorney in whom the client has the most confidence—hinders this policy.

A second dilemma a business person may face as a defendant in patent litigation is safeguarding, to the extent possible, the con-

---

3. While the court retains the right to determine the amount of enhanced damages if willful infringement is found, the issue of willfulness is a question of fact for the jury. *Hoechst Celanese Corp. v. BP Chem. Ltd.*, 78 F.3d 1575, 1583, 38 U.S.P.Q.2d 1126, (Fed.Cir.1996), establishes these factors:

> The issue of "willful" infringement measures the infringing behavior, in the circumstances in which the infringer acted, against an objective standard of reasonable commercial behavior in the same circumstance. Willful infringement is thus a measure of reasonable commercial behavior in the context of the tort of patent infringement. The extent to which the infringer disregarded the property rights of the patentee, the deliberateness of the tortious acts or other manifestations of unethical or injurious commercial conduct, may provide grounds for a finding of willful infringement and the enhancement of damages.

Moreover, "[t]he Federal Circuit has characterized the process as an analysis to determine whether the alleged infringer exercised due care. The potential infringer 'has an affirmative duty of due care that normally requires the potential infringer to obtain competent legal advice before infringing or continuing to infringe....' " *Jurgens v. CBK, Ltd.*, 80 F.3d 1566, 1572–73 (Fed. Cir.1996) (quoting, *Underwater Devices, Inc. v. Morrison–Knudsen, Co., Inc.*, 717 F.2d 1380, 1389–90 (Fed.Cir.1983)). This requirement of obtaining advice concerning "continuing" infringement has been treated as obtaining more than an attorney to defend against a claim of infringement. *Crystal Semiconductor Corp. v. TriTech Microelectronics Intern., Inc.*, 246 F.3d 1336, 1352 (Fed.Cir.2001). This, in turn, has been interpreted as requiring the due care to be ongoing. *Akeva L.L.C. v. Mizuno Corporation*, 243 F.Supp.2d 418, 422 (D.N.C.2003) ("because infringement is a activity, the requirement to exercise due care and seek and receive advice is a continuing duty."). Notwithstanding this affirmative duty, willfulness is not determined by a per se rule, but rather by an actor's intent which may be revealed and inferred from all of the circumstances. *Gustafson, Inc. v. Intersystems Indus. Prods., Inc.*, 897 F.2d 508, 510–511 (Fed. Cir.1990). *Akeva L.L.C. v. Mizuno Corp.*, 243 F.Supp.2d 418, 424 (M.D.N.C.2003).

4. The Federal Circuit has held that where the infringer does not produce an exculpating opinion of counsel, the district court can infer the infringer either did not obtain an opinion or obtained an unfavorable opinion. *Kloster Speedsteel AB v. Crucible, Inc.*, 793 F.2d 1565, 1580 (Fed.Cir.1986); *see also Fromson v. W. Litho Plate and Supply Co.*, 853 F.2d 1568, 1572–73 (Fed.Cir.1988).

5. It is recommended that clients need attorney opinions on potential patent infringement liability primarily for three reasons:

(1) For advice on how to avoid patent infringement;

(2) For information on potential risks of patent infringement liability and potential outcomes of patent infringement lawsuits; and

(3) For protection against a finding that any infringement was willful.

Practicing Law Institute, PATENTS, COPYRIGHTS, TRADEMARKS, AND LITERARY PROPERTY COURSE HANDBOOK SERIES, PLI Order No. G0–011U**715 PLI/Pat 425,** September–October, 2002.

A additional reason is to assure that no patent holder seeks to restrict competition and advancement of product development and technology by assert over broad or invalid patent claims.

fidentiality of the defense lawyer's work product and that lawyer's maximum effectiveness at the risky cost of foregoing the *advice of counsel* defense to a claim of willful infringement. While the Federal Circuit suggests that this latter dilemma can be resolved by district courts granting separate trials on liability and damages/willfulness through bifurcation,[6] this resolution has extraordinary social costs particularly if discovery on wilfulness is deferred until liability has been determined. The patent case will then involve two trials, two jury selections, avoidable duplication in the need to educate the second jury on the background facts of infringement (or validity or enforceability) that provide critical context to the adequacy of the *advice of counsel* defense, and whether the patent validity or infringement issue is a close, complex or a clear question. In addition, such total bifurcation of discovery and trial on damages complicates market determinations for both of the parties by delaying resolution. Furthermore, it deprives the parties of certain data regarding the likelihood of any enhanced damages [and possibly an award of attorney fees] that is essential to meaningful pretrial settlement discussions. In the absence of knowing that advice defendant received, a plaintiff and plaintiff's counsel—in the blind, and possibly further blinded by their "adversarial squint"—may have an exaggerated perception of the willful culpability of defendant making compromise and consensual resolution impossible. For all of these reasons, trial courts understandably treat bifurcation with less enthusiasm than the Federal Circuit. Such a request for bifurcation was denied in this case on July 6, 2002. How these questions of waiver and the advice of counsel defense are handled involve other less obvious, but nonetheless significant, additional transaction costs for the parties and the court depending on the scope and amount of discovery, the voluminous motions and briefings related thereto, whether extensive *in camera* inspections will be required, the allowance and the scope of depositions of opinion counsel and/or litigation counsel—with more disputes and further possible motions over the scope of the waiver. Court determinations allowing broad or near-ly total waiver of all privilege of work product and requiring discovery that is virtually unlimited in time and scope on the patent dispute's most important issues make for a "bright line" and certain degree of ease in court administration. Yet, such rulings can impose numerous, unnecessary and unwarranted costs on a defendant and defense counsel. More importantly, they may alter the very thoroughness and integrity of the legal research and documentation that is essential to effective and competent litigation in our adversary system. Thus, the often proposed solutions of bifurcation, a demand or expectancy for separate opinion counsel and trial counsel, and an inclination for broad determinations on waiver of work product as well as attorney-client protections all have significant undesirable risks and costs.

### I. BACKGROUND

#### A. *Scope of the Present Dispute*

On July 18, 2003, Plaintiffs filed a renewed motion to compel and for evidentiary sanctions (Docket No. 330). In short, Plaintiffs request: (1) all documents relating to the subject matter of the oral opinions of counsel relied upon by Bing–Lear; (2) that all attorneys who rendered oral opinions on matters that impact an advice-of counsel defense to willfulness defense be produced for deposition; (3) a full supplementation to Plaintiffs' Interrogatory No. 11 concerning the substance of the attorney-client communication for Bing–Lear's advice of counsel defense; and (4) other appropriate relief. Following an extensive August 13, 2003, hearing, and for reasons stated on the record, Plaintiffs' motion is GRANTED IN PART.

#### B. *Prior Discovery Related to the Advice of Counsel Defense:*

Sometime in early 2002, Muth submitted its First Request for Production of Documents. In particular, Request No. 14 sought:

Any and all documents which relate or refer to any legal opinions from any source concerning any issued patents relating to

---

6. *Quantum Corp. v. Tandon Corp.*, 940 F.2d 642, 643–44 (Fed.Cir.1991).

rear view mirrors with turn signal indicators, including, but not limited to, patents owned by any Plaintiff.

On February 18, 2002, Bing–Lear responded:

Bing–Lear objects to this discovery as being over broad and as seeking things which are not relevant and likely to lead to the discovery of admissible evidence. Bing–Lear also objects to this request (1) because such documents are protected by the attorney-client privilege and/or work product doctrine, and (2) to the extent directed to trade secrets or other confidential research, development, or commercial information until and unless a suitable protective order is entered by the Court.

Around the same time, Muth submitted its First Set of Interrogatories. Number 11 stated:

Identify each opinion obtained by the Defendant, including but not limited to any opinions received or made available or made known to Defendant from Lear Corporation or its agents, relating to the validity, and enforceability, and infringement of each of the patents-in-suit, including the date authored and the author, the date received, made available or made known by Defendant, each recipient thereof, each person with whom the opinion was discussed, and each item of prior art referred to in the opinion.

On March 8, 2002, Defendant responded:

Bing–Lear objects to this interrogatory to the extent that such information is protected by the attorney-client privilege and/or work product doctrine.

Subject to and without waiving this objection, Bing–Lear responds as follows: Prior to the suit, the law firm of Sabansky [sic] & Todd provided Bing–Lear with an opinion concerning plaintiffs' patents. After this suit was filed, the law firm of Brooks & Kushman has provided Bing–Lear with additional documentary and verbal information and opinions relating to the invalidity, unenforceability, and non-infringement of plaintiffs' patents.

Following this exchange, Plaintiffs retained new trial counsel. In an effort to update their files, in an August 30, 2002, letter Plaintiffs' new counsel: (1) noting that the Court had recently denied Defendant's motion to bifurcate discovery and so "there is no longer any basis on which Bing–Lear can refuse to produce any written opinion of counsel to Muth"; and (2) citing three earlier document requests, including No. 14, therefore requested Defendant to "produce the opinion by Sabansky [sic] & Todd, along with any other non-privileged documents or any other opinion of counsel that Bing–Lear has relied on, or intends to rely on, in this proceeding."

Unsatisfied with Defendant's subsequent production, Plaintiffs, utilizing the language from the above mentioned Request for Documents No. 14, filed an October 1, 2002, motion to compel. They requested, in part, the production of any opinions of counsel relied on by Defendant.

In a December 6, 2002, Discovery Order, addressing Document Request No. 14, Defendant was ordered to determine "whether or not they are going to assert advice of counsel as a defense to any claims of willfulness." If so, Defendant "shall serve Plaintiffs with any and all attorney-client communications with regard to that defense" within seven days following Defendant's deposition of the 30(b)(6) topics for which Michael Muth is being produced as Plaintiffs' witness. Defendant did not object to that Order.

On or around December 12, 2002, Defendant produced a version of the Sobanski opinion of counsel letter that addressed, among other issues, an analysis of whether Defendant's signal mirror infringed the '724 patent ("Sobanski letter"). Defendant did not produce any documents relating to opinion of counsel on the '746 patent or any documents relating to invalidity opinions concerning the '724 patent. The Sobanski letter that was produced also referenced a different legal opinion related to Plaintiffs' patents, indicating that Defendant may have withheld producing additional documents responsive to the December 6 Order. After further prodding from the Court, Defendant produced one more document—an early draft of the Sobanski opinion letter.

On or about January 6, 2003, Plaintiffs served Mr. Sobanski with a FED.R.CIV.P. 45 subpoena seeking a deposition and documents, including those pertaining to his advice of counsel and his opinion letter. Plaintiffs also requested that Mr. Sobanski produce a privilege log for "each and every document and/or communication for which you assert either attorney-client privilege or work product protection." Mr. Sobanski, through his counsel at Brooks Kushman [formerly "Brooks & Kushman"], did not provide these requested documents. Instead, he claimed attorney-client privilege and work-product protection. Thus, on February 3, 2003, Plaintiffs filed a motion "to compel Sobanski's documents."

Following a February 27, 2003, telephonic hearing, a short Discovery Order entered the same day granted Plaintiffs' motion in part. It was noted that the December 6, 2002, Order "which instructs Defendant to serve Plaintiffs with 'any and all attorney-client communications with regard to that [advice of counsel] defense within that seven (7) day period' covers a broad array of documents shared between Defendant and Mr. Sobanski's firm." Accordingly, the Order ordered that:

> [D]efense counsel will review the documents which relate to Muths' patents and will provide a log and explanation of all documents believed not within the order of production. Regarding any documents created prior to the issuance of Muths' '746 patent, defense counsel may submit those for an *in camera* inspection if counsel feels they are not included within the order.[7]

Given Defendant's production to date following the December 6 and February 27 Discovery Orders on this topic, and because they had not heard otherwise, Plaintiffs presumed that Defendant's willfulness defense would be limited to Mr. Sobanski's infringement analysis of the '724 patent.

Accordingly, Plaintiffs submitted a Third Set of Interrogatories, which Defendant answered April 18, 2003. In response to Interrogatories 21 and 22 concerning the scope of

the knowledge of the patents-in-suit and steps taken to avoid infringement of such patents, Defendant asserted: "With regard to the '746 patent, Bing–Lear objects to this interrogatory as it seeks information protected by the attorney-client and work product doctrine." In the same set of supplemental responses, Defendant indicated that with regard to the '724 patent, attorney Sobanski first learned of this patent in January 2000, while searching to locate all patents assigned to K.W. Muth Company relating to mirror technology.

Based on a reasonable interpretation of Defendant's answers to Interrogatories 21 and 22, and the discovery to date, Plaintiffs' counsel, Max Grant, sent defense counsel John Halan an April 29, 2003, letter seeking confirmation that Defendant "will not be relying on any opinion of counsel or other privileged information as a defense to its willfulness infringement of the '746 patent." The letter clearly and specifically requested defense counsel to supplement the interrogatory responses accordingly or otherwise contact Plaintiffs' counsel if his "understanding of Bing–Lear's positions is incorrect." Defense counsel Halan never responded to this letter. By this time, written discovery had been closed and fact depositions were to be completed by June 20, 2003.

On June 18, 2003, Plaintiffs deposed Mr. Kirk Lewis, president of Bing–Lear, because of Defendant's earlier representation that Mr. Lewis possessed knowledge about the defense to the willful infringement claims. During questioning by Plaintiffs' counsel— again to confirm that Defendant was relying solely on the Sobanski opinion letter [which related to the '724 patent] as its defense to willful infringement—Mr. Grant for Plaintiffs asked Mr. Lewis, "Are you asserting the advice of counsel defense as to the '746 patent or just the '724 patent?" Defense counsel Halan interrupted, "I object. He doesn't know the answer to that, but I will say that we are asserting the advice of counsel with regard to both patents" (Lewis June 18, 2003, Deposition at p. 109). This was pre-

---

**7.** At the August 13, 2003, hearing, both parties represented that such a log, which the under-signed will henceforth refer to as an "exclusion log," was never created.

cisely the clarification that Plaintiffs' counsel had sought in his April 29th letter to Mr. Halan. Plaintiffs' counsel then understandably asked how defense counsel could have asserted attorney client and work product protections in its April 18, 2003, responses to the interrogatory concerning steps taken to avoid infringement. Defense counsel Halan said there was information outside "the realms of an opinion of counsel" that would be protected. At the deposition, Mr. Lewis further elaborated that he received opinions, including oral opinions, from attorneys John Halan, Marc Lorelli (of the Brooks Kushman firm) and Susan Kornfield (a nonpatent intellectual property lawyer from the Bodman Longley law firm), who have appeared as trial counsel for Bing–Lear, and attorneys Hess, Panagos and McCarthy, who are in-house counsel to Lear Corporation. Finally, Mr. Lewis indicated that he relied on other information including "diagrams with a lot of patent references and stuff." (There were apparently diagrams from the patents-in-suit.) Supplemental submissions on the current motion demonstrate that Mr. Lewis and in-house patent counsel Robert Hess were given an oral opinion by John Halan on the '746 patent claim of Plaintiffs at an October 24, 2001, meeting. Ms. Kornfield and Mr. Lorelli were also present but gave no opinions but did not disagree with the opinion given by Mr. Halan. Mr. Panagos was not yet hired as surrogate in-house patent counsel to replace Mr. Hess.

While Defendant Bing–Lear had on March 8, 2002, answered Plaintiffs' Interrogatory No. 11 that it had received verbal information and opinions from Brooks Kushman attorneys on the "plaintiffs' patents," it had only indicated in prior discovery responses that an *advice of counsel* defense would be asserted with respect to the '724 patent, and not the '746 patent. Thus, this April 18, 2003, deposition was the first time that Defendant, through counsel Halan, clearly indicated that it would be asserting the advice of counsel defense with regard to *both* the '724 and the '746 patents and that it would be relying on an oral opinion of counsel regarding the invalidity of the '746 patent. Because Mr. Halan was less than forthcoming in failing to response to Mr. Grant's April 29,

2003, letter trying to clarify this very issue before fact discovery closed, Plaintiffs are entitled to additional discovery on this *advice of counsel* defense related to the '746 patent. This is the case, even though defense counsel has been more forthcoming in response to recent Court orders.

After an earlier Plaintiffs' discovery motion, Defendant, on July 18, 2002, was ordered to provide a written declaration regarding its claims concerning its *advice of counsel* defense. Because of Defendant's restrictive earlier responses Defendant was warned in this July 18, 2003, order that its submission had to be comprehensive, because its proofs at trial would be limited to the scope of this response and deposition testimony. Defense counsel submitted this declaration from President Lewis on August 5, 2003, the same day they filed their response brief. Defendant asserts that this response now answers Plaintiffs' original Interrogatory concerning the scope of advice of counsel as a defense to willfulness. It further argues that this declaration should preclude Plaintiffs' need for further discovery. Had this response been earlier provided, this might suffice. But because Defendant's guarded and restrictive prior responses which foreclosed other discovery requests Plaintiffs might have made, Plaintiffs are entitled to additional written and deposition discovery on this issue.

Plaintiffs assert that Bing–Lear's reliance on the advice of counsel defense waives any claim to privilege as to the subject matter of the opinion, citing *Michlin v. Canon, Inc.,* 208 F.R.D. 172 (E.D.Mich.2002). Plaintiffs argue that Bing–Lear's supplemental August 5, 2003, declaration is inadequate for their testing and challenging the advice of counsel defense. Plaintiffs request all documents related to the subject matter waiver and the opportunity to depose Defendant's trial counsel, relying on the expansive discovery allowed in *Novartis Pharm. Corp. v. EON Labs Mfg., Inc.,* 206 F.R.D. 396 (D.Del.2002). Plaintiffs also argue that they are entitled to all documents in defense counsel's possession that relate to the subject matter of oral opinions, relying in large part on *Mushroom Assocs. v. Monterey Mushrooms, Inc.,* 24

U.S.P.Q.2d. 1767, 1771 (N.D.Cal.1992) (holding that "all documents containing work product relevant to the infringement issue must be produced").

The remainder of this opinion will analyze the scope of discovery to be allowed in this case.

## II. ANALYSIS

### I. Legal Standards

#### A. *Wilful infringement*

■ The background for analysis involves the defense to a claim of wilful infringement and the important role *advice of counsel* plays in this. An alleged infringer "who has actual notice of another's patent rights has an affirmative duty to respect those rights." *Read Corp. v. Portec, Inc.,* 970 F.2d 816, 828, 23 U.S.P.Q.2D 1426 (Fed. Cir.1992) (*en banc*). As noted above, 35 U.S.C. § 284's enhanced damages require that willful infringement be proven by "clear and convincing evidence" that the infringer acted in disregard of the patent and had no reasonable basis for believing that it had a right to engage in the infringing acts. *Electro Med. Sys., S.A. v. Cooper Life Scis.,* 34 F.3d 1048, 1056, 32 U.S.P.Q.2D 1017 (Fed. Cir.1994); *see also Read Corp.,* 970 F.2d at 829 (reversing a finding of willfulness and finding that "[n]o reasonable juror could find the asserted proof of willfulness rose to the quantum of clear and convincing evidence"). While the court determines the amount of enhanced damages if willful infringement is found, the issue of willfulness is a question of fact for the jury and not one of law. *Hoechst Celanese Corp. v. BP Chem. Ltd.,* 78 F.3d 1575, 1583, 38 U.S.P.Q.2d 1126, (Fed.Cir. 1996):

> The issue of "willful" infringement measures the infringing behavior, in the circumstances in which the infringer acted, against an objective standard of reasonable commercial behavior in the same circumstance. Willful infringement is thus a measure of reasonable commercial behav-

ior in the context of the tort of patent infringement. The extent to which the infringer disregarded the property rights of the patentee, the deliberateness of the tortious acts or other manifestations of unethical or injurious commercial conduct, may provide grounds for a finding of willful infringement and the enhancement of damages.

#### B. *Advice of Counsel*

■ Seeking competent legal advice before initiating possibly infringing activity is commonly cited as an important factor in determining willful infringement. *Electro Med. Sys.,* 34 F.3d at 1056. There is no assurance that an opinion from counsel necessarily precludes a finding of willful infringement [8] or that a lack of an opinion automatically mandates a finding of willfulness.[9] The standard most often utilized for determining whether opinion of counsel was legally sufficient derives from *Underwater Devices Inc. v. Morrison–Knudsen Co.,* 717 F.2d 1380, 1390, 219 U.S.P.Q. 569 (Fed.Cir. 1983), where it was stated that: "[h]ad [the opinion] contained within its four corners a patent validity analysis, properly and explicitly predicated on a review of the file histories of the patents at issue, and an infringement analysis that, *inter alia,* compared and contrasted the potentially infringing method or apparatus with the patented inventions, the opinion may have contained sufficient internal indicia of creditability [sic] to remove any doubt that M–K in fact received a competent opinion."

■ Factors bearing on the competency of an opinion letter include whether counsel examined the file history of the patent, whether the opinion was oral or written, whether the opinion came from in-house or outside counsel, whether the opinion came from a patent attorney, whether the opinion was detailed or merely conclusory, and whether material information was withheld from the attorney. *See, e.g., Comark Com-*

---

**8.** *Spindelfabrik Suessen–Schurr Stahlecker & Grill GmbH v. Schubert & Salzer Maschinenfabrik Aktiengesellschaft,* 829 F.2d 1075, 1084 n. 13 (Fed. Cir.1987).

**9.** *Electro Med. Sys., S.A. v. Cooper Life Scis., Inc.,* 34 F.3d 1048, 1056–57 (Fed.Cir.1994); *Delta–X Corp. v. Baker Hughes Prod. Tools, Inc.,* 984 F.2d 410, 414 (Fed.Cir.1993).

*munications,* 156 F.3d at 1190–93. It is strongly recommended that the opinion be in writing. *See* John Dragseth, *Coerced Waiver of the Attorney–Client Privilege for Opinions of Counsel in Patent Litigation,* 80 MINN. L.REV. 167, 174–75 (1995). That can decrease or eliminate the discovery needs for underlying work product. Unlike an oral opinion for which accurate reconstruction is problematic due to faded and conflicting memories that are likely complicated by adversarial biases, distortions and blindness that develop during the "white heat" of litigation, a written opinion letter can clearly establish the content, the thoroughness and likely the date of the opinion of counsel. One can evaluate whether a written opinion is detailed, includes an analysis for each claim of the patent at issue, and demonstrates diligent search of the prior art and a review of prosecution history as well as possible counter arguments that will likely be faced and the probability of their success in litigation. A written opinion may additionally reflect the completeness of the data provided to counsel which is discoverable from the client and attorney without implicating more difficult problems of waiver of underlying work product. It will form a basis for further questioning of the client on:

(1) When was the advice sought?

(2) What was known about the attorney's skill, competence and independence?

(3) What information was provided or withheld from the attorney?

(4) What did the client think about the nature and extent of the analysis by the attorney, the opinion's credibility, its value and reasonableness, its cost and the time it took?

(5) How sophisticated was the accused party in patent law and was in-house counsel involved?

(6) Did the client rely on the advice, follow its recommendations, share the opinion with others.[10]

As I noted in *Patent Holding Co. v. TG (USA) Corp.,* 46 U.S.P.Q.2d 1566, 1567, 1998 WL 241203 (E.D.Mich.1998), a judge may need to do an *in camera* review of the advice of counsel documents to determine if there is such possible prejudice to a defendant by requiring pretrial disclosure of the opinion(s) that a complete bifurcation of trial on liability and of discovery and trial on damages is necessary, or whether not bifurcating discovery but merely bifurcating the liability from the damages phase at the same trial with the same jury will provide sufficient protection. As was the case in *Patent Holding,* having a written opinion letter can greatly limit the scope of such an *in camera* review to evaluate possible prejudice and the need and extent of bifurcation. Judges will be far more reluctant to undertake such *in camera* reviews if the review involves not a discrete opinion letter or two provided to the client, but also review of the extensive underlying work product research. This is another reason Courts should encourage *written* advice of counsel over oral opinions.

Limiting the scope of the discovery to exclude work product documents other than the opinion letter(s) (which generally is work product) will create a "safe harbor" incentive for business people to seek *written* advice of counsel. It may also provide them the efficiencies and comfort of using the same trusted patent attorney for pre-litigation advice and later as trial counsel without handicapping that attorney's ability during the litigation to undertake competent and thorough legal, factual and strategic research and thinking without loss of a degree of privacy in that undertaking that the work product doctrine tries to assure. Certain cases determine that the underlying work product is only needed as evidence of what the advice of counsel is when the advice was given orally, and there is no clear written records of it. *See Variable–Parameter Fixture Dev. Corp. v. Morpheus Lights, Inc.,* 31 U.S.P.Q.2d 1158–1160, 1994 WL 97572 (S.D.N.Y.1994) ("Variable Parameter has demonstrated a substantial need for the Casey memorandum, given that the opinion provided by the Rosenblum firm was given orally. Thus, ac-

---

**10.** These items were taken in part from the Practicing Law Institute, PATENTS, COPYRIGHTS, TRADEMARKS, AND LITERARY PROPERTY COURSE HANDBOOK SERIES, PLI Order No. G0–011U715 **PLI/Pat 425,** September–October, 2002.

cess to all documents before the opinion provider is essential to cross-examination."); *see also Frazier Indus. Co., Inc. v. Advance Storage Prods.*, 33 U.S.P.Q.2d 1702, 1703, 1994 WL 761247 (C.D.Cal.1994).

■ Because the issue of willful infringement will only arise if the counsel giving the opinion was *wrong*, the focus of a jury's willfulness/advice of counsel analysis is *not* on the legal correctness of the opinion of counsel—which the jury will have already rejected—but rather on whether the opinion was sufficient to instil a belief in the accused party that a court might reasonably hold the patent invalid, not infringed or unenforceable. *Thorn EMI N. Am., Inc. v. Micron Tech., Inc.*, 837 F.Supp. 616, 621 [29 USPQ2d 1872] (D.Del.1993) ("The facts of consequence to the determination of a claim of willful infringement relate to the infringer's state of mind. Counsel's mental impression, conclusions, opinions or legal theories are not probative of that state of mind unless they have been communicated to that client."); PATENT LAW AND PRACTICE 3d. ed. Federal Judicial Center 198 (2001). This was why *Thorn, Patent Holding* and other cases cited below have limited the scope of what is discoverable to the advice actually provided to the client, and if the opinion is in writing, not requiring production of the lawyer's underlying research and other work product done to draft the advice absent some special circumstances. When the answer to the question of "what advice was given to the client" is clearly documented in a writing, this additional "underlying work product" [11] of the advising lawyer is: (i) of limited potential relevance; [12] (ii) not "reasonably calculated to lead to the discovery of admissible evidence" under FED. R.CIV.P. 26(b)(1); [13] and thus generally (iii) the burden of requiring such discovery "outweighs its likely benefit" under FED.R.CIV.P. 26(b)(2) because the "best evidence" of what advice the client obtained—whether a good or poor quality opinion—is in the writings the client actually received.

## C. *Waiver*

■ It is well settled that when an accused infringer relies upon the advice of counsel as a defense to a charge of wilfulness, the infringer waives attorney-client privilege and work-product immunity. *Abbott Lab. v. Baxter Travenol Lab. Inc.*, 676 F.Supp. 831, 6 U.S.P.Q.2d 1398 (N.D.Ill. 1987). A legal opinion communicated in confidence to a client is generally privileged. Because it includes legal research, analysis, and attorney thought processes commonly anticipating possible litigation, such an opinion, if in writing and thus a "document," would be work product as defined by FED. R. CIV. P. 26(b)(3). Thus, judicial statements that hold reliance on an advice of counsel defense to willful infringement waives client privilege and work product protections refer at least to the protections related to the advice itself. Beyond that advice to the client, there is much disagreement as to the scope of the waiver, particularly as to work product protection both as to subject matter and as to points in time. Indeed, as Justice Scalia noted in discussing the indeterminancy of legislative history, it could be said here that case diversity on the scope of the *advice of counsel* work product waiver "is extensive

11. For purposes of clarity this memorandum distinguishes three types of work product: (1) "opinion work product" refers to the actual written or oral opinion to the client containing counsel's conclusions; (2) "underlying work product" refers to the initial and any subsequent attorney research including counsel's, mental impressions and legal theories related to that opinion, which documents were not directly communicated or provided to the client; (3) "litigation work product" refers to the trial counsel's work in preparing a defense once litigation has commences. The *underlying work product* up to the time of the opinion is rendered is a discrete body of information, as may be the subsequent *underlying work product* that may follow the giving of the opinion prior to commencement of litigation. Because advice of counsel may continue after suit is commenced—e.g. after the court rules on claims construction—it will be far more difficult to separate its *underlying work product* from *litigation work product*, because they likely overlap.

12. *Steelcase, Inc. v. Haworth, Inc.*, 954 F.Supp. 1195, 1199 [43 USPQ2d 1041] (W.D.Mich.1997); *Micron Separations, Inc. v. Pall Corp.*, 159 F.R.D. 361, 363 (D.Mass.1995) (work product materials not probative unless communicated to the client).

13. *Eco Mfg. LLC v. Honeywell Intern., Inc.*, NO. 1:03–CV–0170–DFH, 2003 WL 1888988, at *6 (S.D.Ind., Apr.11, 2003).

and there is something for everybody. As Judge Harold Leventhal used to say, the trick is to look over the heads of the crowd and pick out your friends." [14]

■ With regard to the waiver of attorney client *privilege* that occurs with a choice to use the *advice of counsel* defense, there is no disagreement that the scope of this waiver goes not only to the specific advice of counsel, but also to all other attorney client communications related to the same *subject matter.* *Steelcase, Inc. v. Haworth, Inc.,* 954 F.Supp. 1195, 1198–99 [43 USPQ2d 1041] (W.D.Mich.1997); *In re Sealed Case,* 877 F.2d 976, 980–81 (D.C.Cir.1989); *In re Sealed Case,* 676 F.2d 793, 818 (D.C.Cir. 1982); *Chubb Integrated Sys. v. Nat'l Bank of Wash.,* 103 F.R.D. 52, 63 (D.D.C.1984). This includes the client's questions to the lawyer and material provided to counsel to help render an opinion.

The disagreement is greatest over waiver of *underlying work product* and even *litigation work product.* Some courts treat the scope of work product waiver as related to the "subject matter" as is the accepted practice on the waiver of attorney client privilege. When the advice of counsel is communicated solely in writing, is any work product other than *opinion work product* waived? If the advice is oral, there is no *opinion work product,* but only *underlying work product.* Is it waived at least up to the time of rendering the oral opinion? Is it conceptually consistent to limit work product waiver to the time the opinion was rendered, when the attorney client privilege waiver goes to all communications on the same *subject matter* irrespective of time? Does the work product waiver extend beyond the time the opinion is given if no subsequent or modified opinion is communicated to the client? If there is only written advice of counsel, should some preliminary showing be necessary to invade underlying work product, such as a preliminary inquiry of whether the information was new and different from earlier work product and it would lead a reasonable person to question the validity of the earlier advice of counsel?

Plaintiffs argue for the broadest waiver of work product claiming that Bing–Lear should produce all documents of its counsel relating to the subject matter of the oral opinions of counsel and produce for deposition the attorneys who rendered those opinions. They cite *Akeva L.L.C. v. Mizuno Corp.,* 243 F.Supp.2d 418, 424 (M.D.N.C. 2003), for the proposition that the broad waiver rule leading to the "production of all documents relating to the subject matter of such opinions" is appropriate for situations where the opinion counsel is the trial counsel. Plaintiffs' Brief at 8.

The purposes and goals of privilege and work product are different. Both serve the adversary system, but in different ways. Accordingly, the nature and scope of a waiver need not be identical. The *evidentiary rule* of privilege effects a social good outside the adversary system by respecting the *professional rule* of confidentiality an attorney owes to the client. Privilege and confidentiality seek to foster and safeguard full and candid attorney client communications. Privilege facilitates clients' seeking of legal advice and fully disclosing truthful information by assuring confidentiality to those disclosures and to the attorney's responses. By fostering "full and frank communication between attorneys and their clients [the attorney-client privilege] thereby promote[s] broader public interest in the observance of law and administration of justice." *Upjohn Co. v. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). The privilege belongs to the client.

The work product doctrine, which is largely codified in FED. R. CIV. P. 26(b)(3), serves somewhat different goals allowing an attorney to prepare a case for litigation free of "the prying eyes and ears of opponents." *Fleet Nat'l Bank v. Tonneson & Co.,* 150 F.R.D. 10 (D.Ma.1993):

---

14. ANTONIN SCALIA, A MATTER OF INTERPRETATION, 36 (1997). Never in my career have I encountered so many relevant cases involving "friends"—in date of appearance then Magistrate (now District) Judge Elaine Bucklo in *Baxter (1987),* Magistrate Judges Robert Collings in *Micron Separa-* tions (1995), Joseph Scoville in *Steelcase,* quoting and following Doyle Roland in *Haworth, Inc. v. Herman Miller, Inc.,* case no. 1:92 cv 877, 1995 WL 465839 (W.D.Mich. Jan. 15, 1995), Wayne Brazil in *Electro Scientific* (1997), and Virginia Morgan in *Michlin* (2002).

To the extent there is any risk that they will have to deliver to those opponents their ideas, theories and analyses and those of their consultants, they will be far more circumspect in what they put down or permit their consultants to put down on paper, assuming they remain willing to retain consultants at all. Without the [work product protection], efficiency and effectiveness will, thus, inevitably decline. Also, to the extent such disclosure is actually mandated, less conscientious opponents, who are unable or unwilling to invest the time or money to prepare as thoroughly, will gain a windfall.

\* \* \*

The attorney-client privilege often conceals information that has a direct bearing on the proper resolution of matters in dispute; the work-product [protection] rarely, if ever, does. The substantive content of work product, particularly so-called opinion work product ... is almost certainly of no legitimate use to an opponent. (footnote omitted.) While it would no doubt provide a tremendous tactical advantage to an adversary to be able to pry into the "mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation," FED. R. CIV. P. 26(b)(3), a competent adversary will never need access to such information in order to prepare and present his or her case effectively.[7]

Thus, the work product privilege, unlike the attorney-client [doctrine], does not impede the search for truth in a particular case. Its invocation need never force a court to make a difficult tradeoff between the broad institutional goal of preserving the vitality of the adversary system and the sometimes incompatible goal of achieving justice in the matter before it. It is not a privilege which, to avoid injustice, must be recognized only to the barest extent necessary to achieve its purpose. Indeed, it may fairly be said that work product is protected *because* of its content,

while attorney-client communication is protected *despite* its content.

———————

[7] As Justice Jackson stated in his concurring opinion in *Hickman v. Taylor,* 329 U.S. 495, 516, 67 S.Ct. 385, 396, 91 L.Ed. 451 (1947): "[A] common law trial is and always should be an adversary proceeding. Discovery was hardly intended to enable a learned profession to perform its functions ... on wits borrowed from the adversary."

While *Fleet* dealt with the scope of work product waiver from an inadvertent disclosure, its analysis of the scope of work product is applicable in an advice of counsel defense case such as this. In such a case, the defendant's state of mind concerning the availability of reasonable defenses to an infringement claim puts "at issue" all communications involving the client on that *subject matter,* to or from *any and all* attorneys or other sources, and thus makes them discoverable. *Handgards, Inc. v. Johnson & Johnson,* 413 F.Supp. 926, 929 (N.D.Cal.1976). Because of the continuing obligation to exercise due diligence regarding infringing another's patent, any additional or conflicting opinions received by the accused infringer are discoverable and are not protected by attorney client privilege. Yet, removal of the privilege protections concerning communications between an attorney and client, does not necessarily remove the Rule 26(b)(3) work product protections for *underlying work product* of the attorney that was not relayed to the client and was prepared in support of any such opinions or prepared in the course of a litigation. Rule 26(b)(3) that requires an additional showing of substantial need and "undue hardships" in obtaining "the substantial equivalent." To obtain *pure* work product of an attorney's thoughts and opinions the need must be compelling.[15]

■ Unlike the *subject matter* scope of a waiver for attorney client privilege, production of work product contained in an opinion letter does not necessarily waive all work product protections on documents concerned with the same subject matter, including the

———————

**15.** *See e.g. Holmgren v. State Farm Mut. Auto. Ins. Co.,* 976 F.2d 573, 577 (9th Cir.1992) (opinion work product discoverable "when mental impressions are at issue ... and the need for the

material is compelling"); *Handgards, Inc., v. Johnson & Johnson,* 413 F.Supp. 926, 933 (N.D.Cal.1976).

underlying research documents and prior drafts not shared with the client.

*In re UMW Employee Benefit Plans Litig.,* 159 F.R.D. 307, 310–12 (D.C.1984), noted:

> There appears to be substantial authority for the proposition that a waiver of the attorney work product privilege as to particular documents does not extend to other documents addressing the same subject matter. *See Duplan Corp. v. Deering Milliken, Inc.,* 540 F.2d 1215, 1222–23 (4th Cir.1976) ("broad concepts of subject matter waiver analogous to those applicable to claims of attorney-client privilege are inappropriate when applied to Rule 26(b)(3)"); *Fleet Nat'l Bank v. Tonneson & Co.,* 150 F.R.D. 10, 16 (D.Mass.1993) (even if inadvertent disclosure of one group of documents constituted waiver with respect to those documents, no basis for subject matter waiver); *Grunman[Grumman] Aerospace Corp. v. Titanium Metals Corp. of Am.,* 91 F.R.D. 84, 90 (E.D.N.Y.1981) ("[d]isclosure to an adversary waives the work product protection as to items actually disclosed"); 8 WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 2024 at 209 (1970) ("But disclosure of some documents does not destroy work product protection for other documents of the same character"); Robert J. Franco & Michael E. Prangle, *The Inadvertent Waiver of Privilege,* 26 TORT & INS. L.J. 637, 660 (1991) ("with regard to documents covered by the work product privilege, waiver of the privilege as to one such document will not lead to a subject matter waiver"); Anne G. Bruckner–Harvey, Comment, *Inadvertent Disclosure in the Age of Fax Machines: Is the Cat Really Out of the Bag?* 46 BAYLOR L.REV. 385, 394 (1994) ("The subject matter waiver rule does not extend to a document protected by the work product privilege"). The basis for most, if not all, of this authority is *Duplan Corp. v. Deering Milliken, Inc.,* 397 F.Supp. 1146, 1190–91 (D.S.C.1975), where Judge Hemphill stated:

> > The subject matter waiver doctrine applies only to attorney-client privilege claims and not to work product immunity claims. The distinction, in the eyes of this court, is based on the practical application of such a doctrine to work product documents. If one work product document is either voluntarily or inadvertently produced from either terminated or pending litigation, where does the waiver end? If a subject matter waiver of a work product immunity claim is recognized as a doctrine of law, harsh results will necessarily follow, conceivably causing wholesale production of all work product documents from either a terminated or pending lawsuit whenever production of any work product document is considered a waiver. The net effect of such a rule would be a great reluctance to produce any work product documents for fear that it might waive the immunity as to all similar documents. Such a result is not consonant with the need for economy of judicial time and the avoidance of burdening the courts with in-camera inspections of all conceivably privileged documents. Such a disastrous consequence does not befall a litigant whenever it either voluntarily or inadvertently produces one privileged attorney-client communication because such production would constitute a waiver of only the corresponding communications relating to the responses to and requests for, legal advice on the same subject.

> > Thus, the rule of subject matter waiver for privileged attorney-client communications is manageable whereas a similar rule for work product documents is not manageable. As a result, the former rule is recognized by this court while the latter rule will not be adopted.

*Id.* at 1190 (emphasis in original).

█ This greater concern to narrow the scope of any work product waiver more than a waiver of attorney client privilege is also reflected in the different burdens of proof. As noted in *Greene, Tweed of Del. v. DuPont Dow Elastomers,* 202 F.R.D. 418, 420 (E.D.Pa.2001), the burden is on the party seeking to assert attorney client privilege that it has not been waived, whereas the burden shifts to the party seeking discovery

to show there has been a waiver of work product protections.

The conflict in the advice of counsel defense cases relates to a broad versus a narrow approach to the scope of waiver of work product protections once attorney client privilege has been waived in asserting an advice of counsel defense. *Mushroom Associates,* is often cited for adopting the broad view of waiver regarding work product. It acknowledges that work product immunity is distinct from the attorney client privilege and merits its own analysis.[16] "A party's, '. . . waiver of the attorney-client privilege does not necessarily mean that the protection afforded by the work product doctrine is also breached.'" (citing *Handgards,* 413 F.Supp. at 929). *Mushroom Assocs.,* 24 U.S.P.Q.2D at 1770. *Handgards* describes Rule 26's "substantial need" and "undue hardship" standards for requiring disclosure of work product. *Handgards* notes that even pure work product involving an attorney's opinions could be discovered when that opinion work product was directly at issue and the need for production is compelling. *Handgards,* 413 F.Supp. at 933. *Mushroom Associates* determined that "by asserting the advice of counsel defense, the defendants have waived their attorney work product immunity" for "all documents containing work product relevant to the infringement issue" on which advice was given. The court reasoned that "the work product is directly at issue" because knowing what the attorney thought bore directly on the advice of counsel defense, and the plaintiff's need for information about the attorney's mental processes in order to attack the defense was "compelling." *Mushroom Assocs.,* 24 U.S.P.Q.2d at 1771. It makes the much quoted overstatement:

The only way plaintiff can attack the defendants' advice of counsel defense is by having access to circumstances and factors surrounding that advice. Discovery of mental impression work product may be the only way to have access to the circumstances and factors surrounding the advice. *Id.*

Yet, the ten criteria listed by the Federal Circuit in *Underwater Devices* and *Comark Communications* for evaluating the sufficiency of an opinion of counsel look to "its four corners" and *do not* include the attorney's uncommunicated work product. These ten factors, combined with an examination of the accused party and with the jury's understanding of why and how readily it found infringement [validity or enforceability], will generally dwarf in comparison the potential relevance of the defense lawyer's uncommunicated work product. This is particularly the case if there are no opinions or research that would undermine the reliability of the written opinion that were not discussed and evaluated in that opinion. Courts should keep this in mind in evaluating the Rule 26(b)(3) "need" for the *underlying work product.*

Similar thinking influences the conclusion of the magistrate judges in *Dunhall Pharms., Inc. v. Discus Dental, Inc.,* 994 F.Supp. 1202, 46 U.S.P.Q.2d (BNA) 1365 (C.D.Cal.1998). While the magistrate judge's decision was overturned by the district court, her reasons for rejecting the overly broad assertions of *Mushroom Associates* are persuasive:

I reject the holding and rationale of *Mushroom Associates v. Monterey Mushrooms, Inc.,* [1992 WL 442892,] 1992 U.S. Dist. LEXIS 19664, 24 U.S.P.Q.2d (BNA) 1767, 1770 (N.D.Cal.1992), and its progeny. The

---

16. Cases that have followed this *Mushroom Associates* approach include *Chiron Corp. v. Genentech, Inc.,* 179 F.Supp.2d 1182, 1189 (E.D.Cal. 2001) (requiring party relying on advice of counsel defense to disclose uncommunicated work product because of "the need to decide this case on the fullest, most accurate record possible"), and *Greene, Tweed,* 202 F.R.D. at 424 (requiring disclosure of work product where producing party acknowledged that many of the work-product documents were relevant to invalidity issue raised in advice of counsel defense); *Akeva,* 243

F.Supp.2d 418 (a broad waiver of *underling work product* from the opinion counsel who was separate from trial counsel, but *litigation work product* of separate trial counsel need not be revealed if not revealed to the client or to the opinion counsel. *Akeva* suggests that if trial counsel did give a written or oral opinion to counsel, work product related to that opinion need be disclosed on the issue of infringement, but other work product, such as "trial strategy not related to the infringement issue" could be redacted.)

court's statement in *Mushroom Associates* that 'the *only* way plaintiff can attack the defendant's advice of counsel defense is by having access to circumstances and factors surrounding the advice' ignores the large number of Federal Circuit decision where plaintiffs defeated an infringer's opinion letter without violating the protections of [the work product underlying] privileged communications. 24 U.S.P.Q.2d (BNA) at 1771 (emphasis added). Without the benefit of a sweeping waiver, plaintiffs have successfully attacked the "advice of counsel" defense by presenting evidence that counsel's advice had no effect on defendant's decision to continue its course of conduct. *See, e.g., In re Hayes*, 982 F.2d at 1544 (client did not disclose all the material information to expert); *Minnesota Mining & Manufacturing [v. Johnson & Johnson Orthopaedics, Inc.]*, 976 F.2d [1559] at 1581 [(Fed.Cir.1992)] (opinion obtained from in-house, interested party); *Kori*, 761 F.2d at 656 (opinion letter was obtained well after plaintiff began making the infringing item); *Underwater Devices*, 717 F.2d at 1389 (expert advice not obtained until long after infringement commenced).

*Id.* at 1210. (Bracketed materials added for clarity.)

As noted in my *Patent Holding* decision, two colleagues in our Western District also determined that "the *Mushroom Associates* case is based upon faulty analysis, under which the attorney's state of mind, and not that of the client, becomes paramount." *Patent Holding*, 46 U.S.P.Q.2d at 1569; *Steelcase, Inc. v. Haworth, Inc.*, 954 F.Supp. 1195 [43 USPQ2d 1041] (W.D.Mich.1997). These, *Micron Separations,*[17] and many other cases found *Mushroom Assoc.* unpersuasive when a written opinion letter is involved for reasons stated in *Thorn EMI North America, Inc. v. Micron Tech., Inc.*, 837 F.Supp. 616 [29 USPQ2d 1872] (D.Del.1993):

> The facts of consequence to the determination of a claim of willful infringement relate to the infringer's state of mind. Counsel's mental impression, conclusions, opinions or legal theories are not probative

of that state of mind unless they have been communicated to that client. 837 F.Supp. at 621–22. *See also Micron Separations, Inc. v. Pall Corp.*, 159 F.R.D. 361, 363 (D.Mass.1995) (work product materials not probative unless communicated to the client); *Kelsey–Hayes Co. v. Motor Wheel Corp.*, 155 F.R.D. 170, 171 (W.D.Mich. 1991) (stating that the waiver effected by the "advice of counsel" defense is limited to communications between attorney and client).

*Thorn*, 837 F.Supp. at 621.

In addition to *Mushroom Assocs.* (holding that "all documents containing work product relevant to the infringement issue must be produced"), Plaintiff's cite *Novartis Pharm. Corp.* to assert that they are entitled to all documents in defense counsel's possession. *Novartis* involved a written opinion from counsel who later became co-counsel in the litigation. *Novartis* cites *Mushroom Assoc.* and *Mosel Vitelic Corp. v. Micron Technology, Inc.*, 162 F.Supp.2d 307 (D.Del.2000), as supporting the broad waiver of work product. Yet, the *Novartis* decision is based on a voluntary waiver concept that reasoned:

> Where, as here, a party relies on the advice of counsel defense to a charge of willful infringement, the Court concludes that that party has expressly waived its privilege with respect to attorney-client communications and work product documentation. Having concluded that these privileges are waived, the Court concludes that everything with respect to the subject matter of counsel's advice is discoverable, despite the protection that is normally afforded to attorney-client communications and work product material.

206 F.R.D. at 398.

Yet, because it is unlikely that defendant knew and understood the implications of the advice of counsel defense on the scope of work product waiver—particularly given the muddled state of the law on this very issue— the "voluntary waiver" analysis seems forced. Rather, courts should determine that reliance on advice of counsel in a patent case puts that advice "at issue." Courts then can de-

---

**17.** *Micron Separations, Inc. v. Pall Corp.*, 159   F.R.D. 361, 363 (D.Mass.1995).

termine in the ordinary course what is potentially relevant and discoverable, and if work product is involved, consider the policy, needs, undue hardship and burdens/benefits analysis of Rule 26(b)(2) and (3) jurisprudence. If "waiver" is an issue, it generally will be an "implied waiver," which is actually an estoppel of the assertion of work product protections.

It is repeatedly said that the scope of the waiver is governed by a rule of fairness to the party seeking the discovery. *See e.g., Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir.1992); *Katz v. AT & T Corp.*, 191 F.R.D. 433, 439 (E.D.Pa.2000). "Courts have recognized that it would be fundamentally unfair to allow a party to disclose opinions which support its position and to simultaneously conceal those that are unfavorable or adverse to its position. *Saint–Gobain/Norton Indus. Ceramics Corp. v. General Elec. Co.*, 884 F.Supp. 31, 33 (D.Mass.1995)" *Id.* Yet, it is fairness and some common sense that lie in the core of what should be disclosed under Rules 26(b)(2) and (3).

Unlike *Thorn, Kelsey–Hayes, Steelcase, Patent Holding,* and *Micron Separations,* the *Novartis, Mushroom Assoc.,* and *Mosel* cases find undisclosed *underlying work product* potentially relevant to what was disclosed to the client. *Novartis* and *Mosel* and other recent cases broadening discovery of underlying work product are inspired by the analysis of the imaginative and esteemed author of *Electro Scientific Indus., Inc. v. General Scanning, Inc.*, 175 F.R.D. 539, 544–46 (N.D.Cal.1997). Yet, they do not describe the careful limitations of that decision and other California cases citing and preceding it.

*Electro Scientific* involved separate opinion counsel and litigation counsel from the firm representing Defendant, General Scanning, Inc. ("GSI"). Opinion counsel gave a written opinion dated July 12, 1996, five months prior to litigation and another January 1997 opinion two weeks after litigation began. Defendant intended to rely on the pre-litigation July 1996 opinion letter. Defense counsel volunteered to produce what the judge interpreted to be

all communications, written or oral, between GSI, on the one hand, and, on the other, either its "opinion counsel" or its "litigation counsel"—as long as those communications 'concern' the subject matter of the July 12, 1996 opinion letter and as long as they occurred before December 26, 1996, the date ESI filed the complaint. *Id.* at 541. The battle was over the *underlying work product.* Plaintiff wanted all opinions not limited in time just to pre-litigation and it wanted all *underlying work product.* Because the time issue was not briefed, *Electro Scientific* declined to address it. Acknowledging that *Steelcase, Thorn,* and *Micron Separations* reasoned that "information that did not reach that mind [of the accused client] is irrelevant and, therefore, not discoverable," *Electro Scientific* disagreed. *Id.* at 544.

I agree fully that in litigating the willful infringement issue, it is GSI's mind, not the mind of any of its lawyers, that is in issue, *i.e.,* that is the ultimate target of inquiry. But I do not believe it follows from that proposition that documents in counsel's files that do not directly disclose communications that reached GSI could not have any significant probative value. GSI is claiming that it relied in part on the opinion of its counsel that is set forth in the letter of July 12, 1996. In taking that position, GSI at least implicitly also is asserting that it received no other (oral or written) opinions from counsel, at least before the lawsuit was filed, that were in any material respects different from the opinions reflected in the July 12th letter. In other words, GSI is claiming that this one letter reflects accurately the substance of all of the communications from counsel that reached GSI's mind (before the suit was filed) on whether GSI would be violating ESI's rights under ESI's patents if GSI continued to attempt to manufacture, use, or market products or systems covered by ESI's patents.

How is the trier of fact to know whether this implicit assertion by GSI is true? Is it fair, in circumstances like this, to cut-off ESI's access to evidence that might well have significant probative weight about

whether this important representation by GSI is accurate? Documents in the files of GSI's counsel might be highly probative of whether GSI in fact received additional communications from counsel about the issues addressed in the opinion letter, and about whether any such additional communications included views, information, or analysis that was in any material way different from the views, information or analysis in that letter.

*Id.* at 544.

Defense counsel for GSI made the venturesome alternate arguments that underlying work product of opinion counsel and litigation counsel "that do not directly reflect or advert to communications that reached GSI" would not shed "significant light" on whether other opinions were received, or "if so, whether their content was meaningfully different from the content of the one disclosed communication." To this overstatement, the judge responded with such a force of logic as to command many followers in later cases:

> I disagree—not as a matter of likelihood, but as a matter of real possibility. It is possible that documents in opinion counsel's work product file could reflect very different analyses and conclusions than were set forth in the one disclosed letter. The fact that the analyses and conclusions in the lawyer's private file were clearly at odds with the content of the disclosed opinion would tend to support an inference that there were additional communications between client and counsel and that in those communications the client received opinions that were not consistent with the views expressed in the disclosed letter.
>
> Certainly it would not be rational to assume that everything in counsel's files reached the client, or that counsel communicated to the client all of what he or she really thought, but it would be comparably irrational to assume that there could be no relationship between what counsel really thought (as reflected in her private papers) and what she in fact communicated to her client. In this important sense, evidence about what really was in the lawyer's mind could be quite relevant to the issue of what really was in the client's mind.

> Moreover, it is impossible to foresee all the kinds of evidence that might be found in the kind of work product documents that are in issue here (*i.e.*, documents that do not directly reflect or advert to communications with the client), or all the kinds of ways that the contents of such documents might be used to shed reliable light on the issue of whether the defendant received additional opinions (perhaps orally) that were inconsistent with the opinions reflected in the disclosed opinion letter. So, because we can foresee at least one way in which such private documents might be highly probative on the issue of what really reached the mind of the client, and because it certainly is possible that there are other ways such documents might contribute in important ways to determining the truth about the state of mind of the client, it would be unfair, at least absent a compelling countervailing interest, to cut-off access to evidence and leads of this kind.

*Id.* at 545–46. (Footnote omitted).

The court acknowledged that "[a] conclusion that such material might well be relevant, or might well lead to the discovery of admissible evidence, does not, of course, end our inquiry." *Id.* It then did a careful Rule 26(b) analysis of the respective benefits, burdens and risks needed before removing traditional protections for " 'opinion' work product—the kind that enjoys the highest level of protection." *Id.* While it ruled that disclosure was required, it did so subject to a very restrictive order aimed at *limiting* the potential damage that could result from removing work product protections. *Electro Scientific* limited the disclosure of underlying work product to that done *prior* to the commencement of the litigation, thereby removing the major problem of requiring disclosure of *litigation work product*. It further limited the disclosure to "outside counsel" and prohibited further disclosure or use at trial absent agreement of defendant or by court order and the court suggested that would be restricted to information "materially inconsistent with the July 12th opinion letter." *Id.* at 547.[18]

It is also of significance that the *Electro Scientific* opinion noted that in that case there was uncertainty as to the extent and the timing of communications between opinion counsel and litigation counsel. The suspicion that "litigation counsel" may have affected the content of "opinion counsel's" analysis, advice and/or wording would be a significant factor to consider in a "fairness" and "need" evaluation under Rule 26(b)(3). Indeed in *Mosel,* which embraces this logic of *Electro Scientific,* litigation counsel edited drafts from opinion counsel who then destroyed earlier drafts by throwing out the edited drafts and overwriting the electronic version of the final opinion. Defense counsel argued that Plaintiff's request to strike the advice of counsel defense as a sanction should be denied because the drafts were "work product" and not discoverable under *Thorn* and cases following it. Citing *Cordis Corp. v. SciMed Life Sys., Inc.,* 980 F.Supp. 1030, 1032–33 (D.Minn.1997) and *Electro Scientific, Mosel* repeated the warning of the former that:

> by limiting the waiver of the privilege only to those matters which are communicated to the client, *Thorn* and its progeny have effectively encouraged patent counsel to place only the most favorable version of the facts and the law in their opinion letters, even if these attorneys are aware of other information which is far less helpful to their client.

162 F.Supp.2d at 312, citing *Cordis,* 980 F.Supp. at 1033 n. 1, which refers to risks of opinion letters reflecting "incompetence or wilful artifice." The court did not strike the advice of counsel defense but gave a spoliation instruction that the jury could draw an adverse inference from the destruction of

evidence by patent counsel. 162 F.Supp.2d at 316.

It is also worth noting that while *Cordis* criticizes *Thorn* and *Steelcase* as "both impractical and fundamentally unsound" and further disagrees with the premise stated above that the primary focus of a jury on a written advice of counsel should be within "the four-corners of the opinion," *Cordis* limited the work product produced to "certain experiments" counsel had done that formed the "factual premises" of the opinion letter even if not provided to the client who was apparently the inventor. Unlike legal opinions that most "inventors" could not be competent to evaluate, "we cannot accept that the inventor would be similarly unqualified to assess the validity of the factual premises upon which his patent counsel had framed his legal opinion or that he would be permitted *carte blanche* to accept any factual predicate without question." *Id.* at 1031. Yet, *Cordis* rejected Plaintiff's request for drafts and legal research not shared with the client. Thus it limited the work product disclosure to *factual* issues, and not litigation or pure work product.[19]

*Electro Scientific's* language on the relationship of *underlying work product* to the opinion communicated to the client was relied on in *Dunhall* where the magistrate judge had followed *Thorn* regarding underlying work product, but noted that privileged communications were waived from subsequent counsel including trial counsel. *Id.* at 1209, n. 3. In reversing the magistrate judge on the underlying work product, the court in *Dunhall*—as did *Electro Scientific*—limited the waiver to a time period prior to the commencement of litigation, noting:

**18.** While *Electro Scientific* carefully circumscribed the mischief that its analysis of the *possible* relevance of the opinion counsel's *underlying work product* and its disclosure could cause, later courts—as noted below—have seized *Electro Scientific's* analysis of the possible relevance but jettisoned *Electro Scientific's* safeguards.

**19.** This is a pattern in the cases that after using language suggesting a broad waiver of underlying work product protections, the actual relief ordered avoids the worst of the dilemmas *Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91

L.Ed. 451 (1947), and Rule 26(b)(3) sought to avoid by not ordering work product disclosures after litigation began. Even *Novartis,* which ordered production of all "legal advice" received from *"any* member" of the firm issuing the opinion letter, apparently including oral advice, even after that firm became litigation counsel, only ordered *underlying work product* "forming the basis of" the original opinion letter. It appears to have left to future disputes over underlying work product on any advice—including oral advice—given from that firm as litigation counsel.

Once the lawsuit is filed, the waiver of work product protection ends. This temporal limitation follows from the enhanced interest in protection against disclosure of trial strategy and planning. Following the filing of the lawsuit, defense counsel is engaged in critical trial preparation, often including analysis of the weaknesses of their client's case. Such analysis, while likely related to the subject matter of the asserted defense, is fundamentally different from a similar pre-litigation analysis. In comparison to work product produced prior to the filing of the lawsuit, litigation-related work product deserves greater protection.

994 F.Supp. at 1206.

In addition to quoting the rationale of *Electro Scientific, Dunhall* cites *Hoover Universal, Inc. v. Graham Packaging Corp.*, 44 U.S.P.Q.2d 1596, 1996 WL 907737 (C.D.Cal. Dec. 17, 1996) for the proposition that "[t]he standard for discovery is broader than that for admissibility: the material must 'appear [ ] reasonably calculated to lead to the discovery of admissible evidence.'" FED.R.CIV.P. 26(b)(1).[20] *Hoover* reasoned:

The internal memoranda and other work product of the law firms that prepared the opinion letters in this matter could reveal circumstantial evidence of conflicting or contradictory opinions that were in fact communicated to Graham by counsel. Hoover is entitled to discover such circumstantial evidence and to cross-examine Graham and Graham's counsel about its possible relevance.

*Id.*

Yet, *Hoover*, like *Electro Scientific* and *Dunhall* limited the discovery of underlying work product to periods prior to litigation and, as in *Dunhall*, reversed the magistrate judge on this timing issue of the cutoff for disclosure of work product as "arbitrary and contrary to law." Thus, in each of these cases that accept that a mere "possibility" that rummaging through the underlying work *may* produce some document that could suggest the attorney communicated something that would undermine or alter the client's confidence in the earlier written opinion, courts all demonstrate a great concern about not invading litigation work product.[21]

In the present case, certain oral advice of counsel came *after* litigation had begun, and there are concerns additional oral advice was given. Given the continuing duty of care of an accused party, any information later received that qualified or undermines an earlier opinion would be relevant to the issue of willful infringement from that point forward. *Thermos Co. v. Starbucks Corp.*, 96 C 3833, 1998 WL 781120, at *1 (N.D.Ill. Nov. 3, 1998), involved separate opinion counsel and trial counsel. It also adopted the *Thorn* limitation that only information communicated between the lawyer and the client was relevant to the accused's state of mind on willfulness. Yet, it ordered disclosure from trial counsel of any work product *communicated* to the client that could "contradict or cast doubt" on the opinion counsel's written advice. It stressed that "[t]he scope of this waiver, however, is more limited with regard to the opinion work product of trial counsel," citing *Micron Separations*, 159 F.R.D. at 365 and *Clintec Nutrition Co. v. Baxa Corp.*, 1996 WL 153881, at *1 (N.D.Ill. Mar.28, 1996).

---

**20.** *Dunhall* and *Hoover* also cite *Frazier Industrial Co. Inc. v. Advance Storage Products*, 33 USPQ2d 1702, 1703 (C.D.Cal.1994), to support disclosure of underlying work product and *Hoover* cites *McCormick–Morgan, Inc. v. Teledyne Indus., Inc.*, 765 F.Supp. 611, 614 [21 USPQ2d 1412] (N.D.Cal.1991) #. Yet, these are not useful citations because *Frazier* involved an oral opinion of counsel which is a special circumstance warranting the Rule 26 "need" for more reliable evidence of what the attorney orally said to the client, and *McCormick–Morgan* involved an express waiver by the accused party's counsel of underlying work product as well as opinion work product.

**21.** *SNK Corporation of America v. Atlus Dream Entertainment Co.*, 188 F.R.D. 566 (N.D.Cal. 1999), adopts the reasoning of *Electro Scientific* and *Dunhall* on the potential relevance of underlying work product, but because *SNK* as a malicious prosecution case involving the advice of counsel related to an earlier patent infringement litigation that had been voluntarily dismissed, the disclosures ordered only underlying and litigation work product in that earlier dismissed case, but not the litigation work product in the pending malicious prosecution case.

Quoting *Electro Scientific's* language on the relationship of *underlying work product* to the opinion communicated to the client, *Beneficial Franchise Co. v. Bank One*, 205 F.R.D. 212, 218 (N.D.Ill.2001), adopts the *Thermos* approach to disclosing litigation counsel's work product opinions that "contradict or cast doubt on the disclosed opinion" but dropped the requirement that the items had to have been communicated to the client. It believed that "if negative information was important enough to reduce to a memorandum, there is a reasonable possibility that the information was conveyed in some form or fashion to the client." [22] *Id.*

Unlike *Electro Scientific, Dunhall, Hoover,* and *Greene Tweed,* when there was advice of counsel admittedly given after litigation began, the time of the disclosure cannot be limited to pretrial. Even where there is the suspicion that trial counsel gave oral advice that might undermine confidence in an earlier opinion, limiting the disclosure of work product to that prior to the commencement becomes problematic. *Thermos* limits the risks to requiring litigation counsel disclose work product by following *Thorn,* and requiring that the information be communicated to the client. It also limits the disclosures to "to documents containing 'potentially damaging information' or expressing 'grave reservations respecting the opinion letter.'"

*Beneficial Franchise Co.* adopts the latter subject matter limitation, but unlike *Thermos,* it favors the *Electro Scientific* rationale on relevance over *Thorn* and requires disclosure of trail counsel work product that "contradict or cast doubt on the opinions that were revealed, irrespective of whether the documents indicate on their face that they were conveyed to the client." 205 F.R.D. at 218.

*Akeva L.L.C. v. Mizuno Corp.,* 243 F.Supp.2d 418 (M.D.N.C.2003), provides a thorough analysis of the problems involved with advice of counsel defenses in patent cases. It rejects the *Thorn* and *Steelcase*

line of cases when opinion counsel is trial counsel.

The Court finds that the broad waiver rule requiring full disclosure of documents, even if they were not given to the client, is best suited to the situation *where the opinion counsel is trial counsel* .... In that situation, the opinion counsel has a dual role in advertising the client and, thus, there is a greater need to make sure the opinion is not tainted by bias or other influences....

*Id.* at 424. (Emphasis supplied).

Yet, while acknowledging

that a broader waiver of work product protection might also disclose the trial attorney has been orchestrating a sham opinion with opinion counsel, the Court finds that possibility to be sufficiently remote and more difficult to orchestrate. Therefore, when the opinion counsel is independent, and should nothing else appear, the broader waiver of work product need not be employed.

*Id.*

The Court also made it clear that any litigation work product that involved "trial strategy" not related to the infringement issue upon which advice was given, could be redacted. While this dual approach has certain appeal, it is clearly a compromise. It also has a significant social cost. While the additional expenses of requiring that separate opinion counsel be hired in addition to trial counsel may be beneficial for the patent bar, it is not necessarily good for business and the economy. In addition, if courts are going to always require trial counsel to disclose work product when initial or supplemental advice is given to a client, it will have an adverse effect not only on the costs to the client, but also on the availability of opinion counsel. In the present case, Plaintiffs' counsel noted that his firm would not act as opinion counsel to avoid this dilemma. Obviously market forces will reward the elite

**22.** Just days before, *Greene, Tweed of Del. v. DuPont Dow Elastomers,* 202 F.R.D. 418, 420 (E.D.Pa.2001), adopted the broad waiver of underlying work product requiring only relevance to the subject of the prior opinion, and not requiring a showing of the underlying work product being inconsistent with it, because all of the documents sought were prepared prior to the commencement of the litigation, the court found the "time" question to be "moot."

patent law lawyers who prefer the lucrative litigation field of patent law over the opinion field with its more limited financial rewards. Yet, removing large cohorts of the nation's best patent lawyers from giving opinions is socially harmful.

*Eco Mfg. v. Honeywell Intern., Inc.*, 2003 WL 1888988 (S.D.Ind., April 11, 2003), while a trademark case, involved the same advice of counsel issue for opinions of a trial counsel and an earlier opinion counsel. *Eco* adopted the *Thorn* position and noted numerous items, including internal indicia of credibility of the written opinion and external factors such as the client's level of sophistication and involvement that would assist in evaluating the advice of counsel defense. It noted that given these multiple ways to evaluate the client's state of mind concerning the opinion letter, absent some special and suspicious factor as the attorney being "less than forthcoming" as in *Michlin,* disclosure of underlying work product, or even deposing the counsel giving the opinion, "would be a waste of time and would not likely lead to the discovery of admissible evidence. Even if the attorney were to confess in a deposition that he had come to believe his opinion was wrong, such an admission would say nothing about the relevant intent—that of the attorney's client." *Id.* at *6.

Given this tour of diversity in the cases plus the tendency to resolve such cases on their particular facts, one can develop the above noted cynicism of some concerning courts' uses of legislative history—"the trick is to look over the heads of the crowd and pick out your friends." Yet, some major considerations distilled from these cases should guide the courts.

As suggested by the Federal Circuit, trial courts should encourage written opinions that provide the best evidence of what advice was given, thoroughness, and timing. Absent some "plus" factor warranting a "need" under Rule 26(b)(3), courts should be reluctant to require disclosure of underlying work product when counsel has provided a competent written opinion letter or memorandum. While the Federal Rule 26 allows discovery of all information that is relevant to a claim or defense—provided that it is reasonably calculated to lead to the discovery of admissible evidence—this is qualified by an exclusion of items that are privileged or fall within the protections of Rule 26(b)(3). "Good cause" is now needed for broader discovery into matters "relevant to the subject matter involved in the action." While *Hoover* and *Dunhall* are correct in arguing that discovery rules are broader than admissibility rules, their analysis is incomplete because this teaching does not undo the limitation on potentially relevant discovery set out in both Federal Rules 26(b)(2) and (3). Also, if a "possibility" of relevance were sufficient to justify broad discovery, there is always a possibility that unrestricted searches through a corporations files and e-mails would lead to relevant and admissible evidence. Yes, there is always a "possibility" that trial counsel is being overly selective in disclosures and document reviews. Yet, under the burdensomeness and balancing tests of Rules 26(b)(3)(i) and (iii), we have traditionally resisted granting charters for discovery "fishing expeditions." *Electro Scientific* acknowledged that whether patent counsel had hidden adverse work product was "not [ ] a matter of likelihood, but [ ]a matter of real possibility." This standard if unchecked by the considerations of Rules 26(b)(2) and 26(b)(3) will justify widespread, unnecessary, and unproductive excursions into undisclosed attorney files and computers, and could significantly and adversely alter the way lawyers practice, document and retain data and research. *Electro Scientific* did a proper work product analysis in addition to its "possible relevant" analysis. It drew careful boundaries on what it ordered discovered to avoid a wholesale erosion of *Hickman's* policy concerns. Yet, its relevance analysis in less skilled or less careful judicial hands will cause excessive and harmful intrusions. In considering the scope of work product waiver, *Katz* noted that "[t]he scope of the waiver, however, is narrowly construed in patent cases." 191 F.R.D. at 440. This is a guidepost that will help restrain courts from straying beyond the reservation of reason in discovery orders.

The opinions in *Novartis, Cordis, Hoover, Dunhall, Mosel,* and possibly *Electro Scientific* suggest that some courts may have de-

veloped a degree of skepticism about the integrity of patent counsel in their highly contentious field that provides great financial rewards to the victors. The patent bar should be concerned if certain judicial officers feel that they are not only more adversarial than other litigators, but less forthright and more cunning. As noted in *Eco Manufacturing,* 2003 WL 1888988, at *5 n. 2, this Court in *Michlin v. Canon, Inc.,* 208 F.R.D. 172 (E.D.Mich.2002), ordered "discovery of attorney work product that had not been communicated to the client, [relying] on the fact that the defense counsel and been 'less than forthcoming with the court.'" *Id.* at 173. *Michlin* was concerned that trial attorneys might have manipulated the information provided to their colleague who wrote the opinion letter. *Id.* at 174. *Eco* is correct in concluding that "[i]n such cases, the reasons for finding a broader waiver may be compelling." *Michlin* also involved trial counsel and opinion counsel in the same firm, and the judge was suspicious of "counsel play[ing] cute by carefully circumscribing information provided to opinion counsel and even possibly editing the written opinion." 208 F.R.D. at 174. As was the case in *Mosel,* if there are suspicions that trial counsel is editing the opinion letter as part of the trial strategy, fairness may require greater disclosure of work product. Yet, before assuming that all patent counsel have been less than forthcoming, deceptive, and blinded by their "adversarial squint," courts should require some additional showing—a "plus factor"—before adopting the broadest reaches of waiver of work product, particularly with trial counsel.

Before a court determines whether to do an *in camera* inspection of attorney-client documents to see if they contained evidence of the crime/fraud exception, the Supreme Court has adopted a prerequisite test. *United States v. Zolin,* 491 U.S. 554, 572, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989). The moving party must use information extraneous to the attorney-client documents to demonstrate that it was reasonably possible that an *in camera* examination may show that the crime/fraud exception is applicable. Similarly, with the burden of demonstrating work

product waiver on the moving party, that party, as a prerequisite to a broad waiver of underlying work product in a case with a *written* advice of counsel, should "use information extraneous to the [work product] documents to demonstrate that it was reasonably possible that an *in camera* examination [or an order of production] may show that" the work product contains information that is significantly different from the written advice of counsel or would cause a reasonable person to call that written advice into question.

A good advice of counsel letter will be thorough in analyzing counter arguments and potential legal or factual issues that might cause a risk of loss to the accused party. If these analyses of counter arguments are absent, when it is obvious that they exist, this may lead to a justification for underlying work product disclosure. But not before preliminary discovery as to whether there is any such undisclosed information or counter arguments. Under Rule 26(b)(3) there is a "need" to know—and a justification for an interrogatory asking—about such negative information in opinion counsel's—or possibly trial counsel's files. It is only such undisclosed negative information in counsel's work product that is potentially "relevant" in the logic of *Electro Scientific.* The moving party has much insight and understanding into possible theories favoring its position and a competent attorney should consider and discuss in a thorough opinion letter. Plaintiff's counsel will know what sorts of data, research, and counter-arguments should have been considered by opinion counsel. If there are counter arguments not in the written opinion and also not in opinion counsel's underlying work product, this inquiry will reveal no relevant evidence, but its pursuit may have a cautionary and enlightening effect of the accused client's confidence in the opinion counsel.

In addition to the risk that such undisclosed "adverse" documents and research may come out in the infringement trial and discovery process, courts should not ignore the other factors that the honest and competent members of the patent bar—hopefully the overwhelming majority—will have as an incentive to provide a thorough and balanced

opinion letter. First, the Rules of Professional Conduct 1.1, 1.3, 1.4 all require an opinion counsel to be thorough and draft an opinion that meets the expectancies set out by the Federal Circuit. A poorly written letter may not have the internal indicia of reliability that are needed to avoid a willfulness enhancement if the case is lost. A client may face a stinging and damning cross examination if attempting to rely on an opinion letter that is too "cosmetic." In addition to the risk of loss at trial, opinion counsel will risk loss of that client, loss of reputation, and loss of other clients in the future. Such counsel may also face a malpractice action by his disgruntled client stung with treble damages, in which case there will be no work product limitations on what that attorney knew, when it was known and what was not researched or known but should have been.

As with opinion counsel, trial counsel also should provide any initial or supplemental advice of counsel in written form, because courts should not automatically assume underlying work product must be disclosed absent the prerequisite showings noted above. This opinion has noted the adverse social costs if every accused client must retain separate counsel. If trial counsel's written opinions are thorough and address plaintiff's arguments adequately, courts should provide trial counsel the safe harbor for other work product that Rule 26(b) anticipates.

While the Federal Circuit believes that many of these problems are to be solved through bifurcation, many trial courts resist bifurcating more than damages from liability with the same jury. Thus, bifurcation is not an adequate solution. Nor is the Federal Circuit likely to abandon the adverse inference that will be given against an accused party who chooses not to rely at trial on an advice of counsel defense against a claim of willful infringement. Thus, trial courts will continue to struggle with balancing the many considerations identified in this opinion in determining the scope and time frame for any waiver of work product protections.

### D. *Order*

■ Because Bing–Lear's trial counsel gave an oral opinion to Defendant on October 24, 2001, there is no clear written record of the advice given. As in *Frazier Industrial* and *Variable–Parameter*, it is found that defense counsel's underlying work product is likely relevant to what oral advice was given to Bing–Lear. It is further determined that there is a compelling need to disclose these documents that are otherwise unavailable to Plaintiffs' counsel. Within two weeks of this order, defense counsel shall produce any such documents relevant to infringement of the '746 patent that were prepared for or reviewed by any defense counsel prior to the October 24, 2001, meeting.

It is further determined that because Mr. Halen did not respond in a timely fashion to Mr. Grant's letter of inquiry of April 29, 2003, defense counsel has been less than forthcoming in disclosing Defendant's reliance on that October 24, 2001, oral advice of counsel as a defense to the claim of wilful infringement of the '746 patent. Defense counsel asserts that there has been no further oral advice to his client, and he has produced declarations of two other Bing–Lear counsel who attended the October 24, 2001, meeting who confirm neither of them has given any different or other advice. Yet, if there is any post-October 24, 2001, work product that reflect any different, additional or contrary information, and which documents might lead a reasonable person to question the validity, scope or reliability of any earlier advice of counsel, those documents would be relevant to whether any subsequent oral advice was given. This question of other oral advice will be explored at Mr. Halen's and others' depositions. If any such post October 24, 2001, documents exist, it is found that there is a compelling need for disclosure of them, and defense counsel is to identify any such documents and provide them to Plaintiffs' counsel within two week of this order.

SO ORDERED.