# United States Court of Appeals
## For the First Circuit

---

Nos. 03-1726
    03-1784

IN RE KEEPER OF THE RECORDS
(GRAND JURY SUBPOENA ADDRESSED TO XYZ CORPORATION).

---

XYZ CORPORATION,
Appellant,

v.

UNITED STATES OF AMERICA,
Appellee.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

---

Before

Selya, Lipez and Howard, Circuit Judges.

---

William F. Lee, with whom Robert D. Keefe, Stephen A. Jonas, Mark D. Selwyn, Hale and Dorr LLP, Richard G. Taranto, and Farr & Taranto were on brief, for appellant.
James E. Arnold, Trial Attorney, United States Department of Justice, with whom Michael K. Loucks, Chief, Health Care Fraud Unit, and Michael J. Sullivan, United States Attorney, were on brief, for appellee.

---

October 22, 2003

---

**SELYA**, <u>Circuit Judge</u>.  Although the attorney-client privilege may be the most venerable of the privileges for confidential communications, its accouterments are not the most clearly delineated.  These appeals, which require us to answer delicate questions concerning implied waivers of the privilege, bear witness to that point.

The appeals have their genesis in an investigatory subpoena duces tecum issued by a federal grand jury (we use the adjective "investigatory" because no indictments have yet eventuated from the grand jury probe).  The subpoenaed party, a corporation, refused to produce certain of the requested documents on the ground that they were shielded by the attorney-client and work-product privileges.  The government sought to compel production, contending that any attendant privilege had been waived.  The district court, eschewing an evidentiary hearing, ordered the corporation to produce the documents and cited it for contempt when it declined to do so.  These appeals — there are two because the corporation filed a notice of appeal after the court ordered production of the withheld documents and another after the court adjudged it in contempt — followed.

After careful consideration, we conclude that the record fails to support the lower court's finding of a broad subject matter waiver.  Accordingly, we reverse the turnover order and vacate the contempt citation.

## I.  BACKGROUND

We start with an abbreviated account of the events leading to the turnover order.  Consistent with the secrecy that typically attaches to grand jury matters, see, e.g., Fed. R. Crim. P. 6(e), these appeals have gone forward under an order sealing the briefs, the parties' proffers, and other pertinent portions of the record.  To preserve that confidentiality, we use fictitious names for all affected parties and furnish only such background facts as are necessary to provide ambiance.

In the fall of 1998, XYZ Corporation (XYZ) began distributing a neoteric medical device.  Soon after distribution began, XYZ learned that, on some occasions, the device was not functioning properly.  It conducted an internal investigation and sought the advice of outside counsel to determine an appropriate course of action.

In fairly short order, XYZ made a preliminary decision to withdraw the device from the market (at least temporarily).  Before doing so, however, XYZ's existing supply agreement obligated it to consult with its co-venturer, Smallco.  Representatives of the two companies conferred telephonically.  The participants in that discussion included two officers of XYZ, outside counsel for XYZ (Bernard Barrister), the principals of Smallco, and Smallco's

medical advisor.[1]  During this conversation, which we shall hereafter refer to as "the call," Barrister advocated XYZ's position in the face of strong counterarguments from the Smallco hierarchs (who wished to keep the device on the market). Unbeknownst to XYZ, Smallco recorded the call.

The next day, XYZ contacted the Food and Drug Administration (the FDA) to discuss the emerging problems.  A dialogue ensued.  Less than one month after its initial contact with the FDA, XYZ voluntarily withdrew the device from the market.

The Department of Justice got wind of what had transpired and commenced an investigation into the distribution of the device. As part of this probe, a federal grand jury issued a subpoena requiring XYZ to produce an array of documents.[2]  XYZ withheld certain of the documents, instead producing privilege logs indexing what had been retained and the claims of privilege applicable thereto.  As early as April of 2001, the government requested XYZ to waive its claims of privilege.  XYZ refused.

In late 2001, the government obtained a tape recording of the call.  The government thereafter asked XYZ for permission to

---

[1]There is some suggestion in the record that two other employees of XYZ were on the line during the call.  We need not resolve this uncertainty as the presence or absence of these individuals would not affect our analysis.

[2]The grand jury also caused subpoenas duces tecum to be served on Barrister and Barrister's law firm.  Those subpoenas are not before us (although we note parenthetically that neither recipient has surrendered the documents).

audit the tape. XYZ replied that it would not seek to prevent the government from listening but admonished that this decision should not be viewed as a waiver of any privilege protecting other communications. The government agreed — in writing — to this condition. The investigation continued.

In February of 2002, federal prosecutors met with XYZ's new outside counsel to inform XYZ of the direction of their investigation. Pursuant to the request of a government attorney, XYZ's counsel authored two letters responding to concerns voiced at the February meeting. Each contained a footnote on the first page stating explicitly that the letter should not be construed as a waiver of the attorney-client or work-product privileges.[3] Following this correspondence, representatives of XYZ again met

---

[3]The language, in its entirety, read:

> We submit this letter pursuant to Rule 11(e)(6) of the Federal Rules of Criminal Procedure. This letter may not be used as evidence against [XYZ] or any subsidiary, affiliate, successor or assign, employee or agent, in any civil or criminal proceeding. This letter describes certain facts as we understand them from the record developed during the Government's investigation. It is not intended to, and should not be interpreted to, constitute admissions on behalf of [XYZ] or any related entities or persons. It also is not intended, and should not be construed, as any waiver of the attorney-client, the attorney work product, or any other applicable privilege.

with the prosecutors to discuss the possible indictment of XYZ and/or its officers. This meeting took place in May of 2002.

In April of 2003 — after persistently requesting a voluntary waiver of the attorney-client privilege for two full years — the government changed its tune. It repaired to the federal district court and filed a motion to compel production of the disputed documents. In its motion, the government argued in effect that XYZ already had waived the attorney-client privilege as to the most important documents described in the subpoena. The motion asserted that, during the call, Barrister had given legal advice in the presence of third parties and had disclosed legal advice previously provided to XYZ. In the government's view, this conduct effected a waiver of the attorney-client privilege as to all communications anent the marketing and withdrawal of the device for a period extending from August 12, 1998 to October 8, 1998. As a fallback, the government asseverated that XYZ had waived the attorney-client privilege by means of the pre-indictment presentations made in response to the prosecutors' requests. To close the circle, the government maintained that the work-product doctrine, if applicable at all, likewise had been waived.[4]

---

[4]In addition, the government claimed that the crime-fraud exception to the attorney-client and work-product privileges abrogated any protections that had not been waived. Because the district court did not reach this claim, we express no opinion on it. The government remains free, if it so chooses, to reassert this claim in the district court.

The district court, acting ex parte, granted the motion to compel. In a four-sentence order, the court ruled that XYZ had "waived its attorney-client privilege with respect to the subject matter of the [call]." When the government moved for an expedited hearing to clarify the order and XYZ sought reconsideration, the district court again acted summarily. Without either conducting an evidentiary hearing or entertaining argument, it ruled ore sponte that XYZ's waiver of the attorney-client privilege applied both retrospectively (i.e., to communications before the call relating to the "same matter") and prospectively (i.e., to communications after the call relating to the "same matter").

In its bench decision, the district court went well beyond the three-month waiver window envisioned by the government; it declared, in effect, that the waiver was to operate without limit of time (indeed, the court noted, as to future communications, that the waiver would have effect "so long as people are talking about that same subject," and might apply up to the time of trial). The court exempted from the waiver any attorney-client communications about the waiver issue itself and provided guidance as to the scope of the waiver by referring to the "doctrine of completeness." The court declined to resolve any additional issues, stating that it would cross those bridges as the need arose.

Notwithstanding the district court's order, XYZ refused to produce the documents. The district court held the corporation in contempt (thus brushing aside, inter alia, its claim of a work-product privilege),[5] but stayed further proceedings pending appellate review. We have jurisdiction over the ensuing appeals because XYZ subjected itself to a citation for contempt. See In re Grand Jury Subpoenas, 123 F.3d 695, 696-97 (1st Cir. 1997).

## II.  STANDARD OF REVIEW

On an appeal concerning a claim of privilege, the standard of review depends on the precise issue being litigated. See Cavallaro v. United States, 284 F.3d 236, 245 (1st Cir. 2002); United States v. Mass. Inst. of Tech., 129 F.3d 681, 683 (1st Cir. 1997). We review rulings on questions of law de novo, findings of fact for clear error, and judgment calls — such as evidentiary determinations — for abuse of discretion. Cavallaro, 284 F.3d at 245. The standard of review is not altered by the fact that the district court granted the motion without much elaboration of its thinking. FDIC v. Ogden Corp., 202 F.3d 454, 460 (1st Cir. 2000). "Although a lower court's elucidation of its reasoning invariably eases the appellate task, motions often are decided summarily. . . . [W]e are aware of no authority that would allow us

---

[5]This implied dismissal of the work-product privilege was fully consistent with comments made by the court in the course of its earlier bench decision.

automatically to vary the standard of review depending on whether a district court has taken the time to explain its rationale." Id.

With these background principles in mind, we proceed to the merits. In undertaking that task, we are mindful that, on the facts of this case, the question whether XYZ has waived the attorney-client privilege is governed by federal common law. United States v. Rakes, 136 F.3d 1, 3 (1st Cir. 1998).

## III. ANALYSIS

Despite a grand jury's vaunted right to every man's evidence, it must, nevertheless, respect a valid claim of privilege. United States v. Calandra, 414 U.S. 338, 346 (1974). But the party who invokes the privilege bears the burden of establishing that it applies to the communications at issue and that it has not been waived. See State of Maine v. United States Dep't of the Interior, 298 F.3d 60, 71 (1st Cir. 2002); United States v. Bollin, 264 F.3d 391, 412 (4th Cir. 2001). Thus, XYZ must carry the devoir of persuasion here.

The attorney-client privilege is well-established and its rationale straightforward. By safeguarding communications between client and lawyer, the privilege encourages full and free discussion, better enabling the client to conform his conduct to the dictates of the law and to present legitimate claims and defenses if litigation ensues. See Upjohn Co. v. United States, 449 U.S. 383, 389 (1981). Still, the privilege is not limitless,

and courts must take care to apply it only to the extent necessary to achieve its underlying goals. In re Grand Jury Subpoena (Custodian of Records, Newparent, Inc.), 274 F.3d 563, 571 (1st Cir. 2001). In other words, the attorney-client privilege must be narrowly construed because it comes with substantial costs and stands as an obstacle of sorts to the search for truth. See United States v. Nixon, 418 U.S. 683, 709-10 (1974).

The dimensions of the privilege itself are reasonably well honed. The privilege protects only those communications that are confidential and are made for the purpose of seeking or receiving legal advice. See Bollin, 264 F.3d at 412; see also 8 John Henry Wigmore, Evidence § 2292, at 554 (John T. McNaughton ed. 1961). The idea that the attorney-client privilege may be waived is a direct outgrowth of this well-established construction. When otherwise privileged communications are disclosed to a third party, the disclosure destroys the confidentiality upon which the privilege is premised. See 2 Paul R. Rice, Attorney-Client Privilege in the U.S. § 9:79, at 357 (2d ed. 1999).

Waivers come in various sizes and shapes. The easy cases tend to be those of express waiver. See, e.g., United States v. Lussier, 71 F.3d 456, 462 (2d Cir. 1995); United States v. Kingston, 971 F.2d 481, 490 (10th Cir. 1992); Catino v. Travelers Ins. Co., 136 F.R.D. 534, 536-37 (D. Mass. 1991). The more difficult cases tend to involve implied waivers. While it is

-10-

generally accepted that conduct can serve to waive the attorney-client privilege by implication, see, e.g., Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 503.41 (Joseph M. McLaughlin ed. 1997) (collecting cases), the case law does not offer much assistance as to how broadly such implied waivers sweep. Like most courts, this court has yet to develop a jurisprudence clarifying the scope of such implied waivers. See United States v. Desir, 273 F.3d 39, 45 (1st Cir. 2001).

In approaching these unanswered questions, we start with the unarguable proposition that the attorney-client privilege is highly valued. Accordingly, courts should be cautious about finding implied waivers. See In re Grand Jury Proceedings, 219 F.3d 175, 186 (2d Cir. 2000). Claims of implied waiver must be evaluated in light of principles of logic and fairness. See 2 Rice, supra § 9:79, at 357. That evaluation demands a fastidious sifting of the facts and a careful weighing of the circumstances. Desir, 273 F.3d at 45-46. Considering the need for this precise, fact-specific tamisage, it is not surprising that the case law reveals few genuine instances of implied waiver. See 8 Wigmore, supra § 2327, at 635.

## A. **The Call**.

With these considerations in mind, we turn first to the government's contention that XYZ impliedly waived the attorney-client privilege when it "sought, obtained, and discussed legal

-11-

advice" from Barrister in the presence of outsiders. Appellee's Br. at 26. The district court not only found such a waiver but also concluded that it extended, without limit of time, to all past and future communications on the subject matters discussed during the call. We think that the court erred as a matter of law in making these determinations.

For the attorney-client privilege to attach to a communication, it must have been made in confidence and for the purpose of securing or conveying legal advice. See Cavallaro, 284 F.3d at 245; see also 8 Wigmore, supra § 2292, at 554. The privilege evaporates the moment that confidentiality ceases to exist. With isthmian exceptions not pertinent here, the presence of third parties is sufficient to undermine the needed confidentiality. See 8 Wigmore, supra § 2311, at 601-03 & nn. 6-8 (collecting cases). So here: XYZ knew that third parties — representatives of Smallco — were participating in the call. Thus, it could not have had any expectation of confidentiality as to matters discussed therein. The lack of such an expectation shattered the necessary confidentiality. See In re San Juan Dupont Plaza Hotel Fire Litig., 859 F.2d 1007, 1016 n.6 (1st Cir. 1988) ("Absent an expectation of confidentiality, none accrues.").

The short of it is that Barrister, regardless of his professional relationship with XYZ, did not provide confidential advice during the call but, rather, merely helped to advocate XYZ's

-12-

position to its co-venturer. Consequently, the communications made during the call were not confidential (and, therefore, not subject to a colorable claim of privilege).

The fact that no privilege attached to the call brings the government's waiver argument into sharper focus. It is crystal clear that any previously privileged information actually revealed during the call lost any veneer of privilege. See, e.g., von Bulow v. von Bulow (In re von Bulow), 828 F.2d 94, 102-03 (2d Cir. 1987); In re Sealed Case, 676 F.2d 793, 817-18 (D.C. Cir. 1982). XYZ does not contest the occurrence of such a waiver (indeed, it never listed the call on its privilege log). Rather, the bone of contention is whether that waiver had a ripple effect, i.e., whether it reached anything beyond that which was actually disclosed. We think not.

There was no express waiver, so the question is one of implied waiver. It is well accepted that waivers by implication can sometimes extend beyond the matter actually revealed. See, e.g., In re Grand Jury Proceedings, 219 F.3d at 182-83; Sedco Int'l, S.A. v. Cory, 683 F.2d 1201, 1206 (8th Cir. 1982). Such waivers are almost invariably premised on fairness concerns. See von Bulow, 828 F.2d at 101-03. As one respected treatise explains, "[t]he courts have identified a common denominator in waiver by implication:  in each case, the party asserting the privilege placed protected information in issue for personal benefit through

some affirmative act, and the court found that to allow the privilege to protect against disclosure of that information" would have been unfair to the opposing party. 3 Weinstein, supra § 503.41[1]. See also Sedco, 683 F.2d at 1206 (noting that courts have found waiver by implication when a client (i) testifies concerning portions of an attorney-client communication, (ii) places the attorney-client relationship itself at issue, or (iii) asserts reliance on an attorney's advice as an element of a claim or defense).

A paradigmatic example of this phenomenon is a case involving an advice of counsel defense. When such a defense is raised, the pleader puts the nature of its lawyer's advice squarely in issue, and, thus, communications embodying the subject matter of the advice typically lose protection. See, e.g., United States v. Bilzerian, 926 F.2d 1285, 1292 (2d Cir. 1991). Implying a subject matter waiver in such a case ensures fairness because it disables litigants from using the attorney-client privilege as both a sword and a shield. Were the law otherwise, the client could selectively disclose fragments helpful to its cause, entomb other (unhelpful) fragments, and in that way kidnap the truth-seeking process.

Virtually every reported instance of an implied waiver extending to an entire subject matter involves a judicial disclosure, that is, a disclosure made in the course of a judicial proceeding. See von Bulow, 828 F.2d at 103 (collecting cases).

-14-

This uniformity is not mere happenstance; it exists because such a limitation makes eminently good sense. Accordingly, we hold, as a matter of first impression in this circuit, that the extrajudicial disclosure of attorney-client communications, not thereafter used by the client to gain adversarial advantage in judicial proceedings, cannot work an implied waiver of all confidential communications on the same subject matter. Accord von Bulow, 828 F.2d at 102-03; Yankee Atomic Elec. Co. v. United States, 54 Fed. Cl. 306, 316 (2002).

The rationale behind our holding is self-evident. When an attorney participates in an extrajudicial meeting or negotiation, his participation alone does not justify implying a broad subject matter waiver of the attorney-client privilege. There is a qualitative difference between offering testimony at trial or asserting an advice of counsel defense in litigation, on the one hand, and engaging in negotiations with business associates, on the other hand. In the former setting, the likelihood of prejudice looms: once a litigant chooses to put privileged communications at issue, only the revelation of all related exchanges will allow the truth-seeking process to function unimpeded. In the latter scenario, however, such concerns are absent. The party has introduced its lawyer into the negotiations, but that act, in and of itself, does nothing to cause prejudice to the opposition or to subvert the truth-seeking process.

-15-

Furthermore, a rule that would allow broad subject matter waivers to be implied from such communications would provide perverse incentives: parties would leave attorneys out of commercial negotiations for fear that their inclusion would later force wholesale disclosure of confidential information. This would strike at the heart of the attorney-client relationship — and would do so despite the absence of any eclipsing reason for the implication of a waiver. Where a party has not thrust a partial disclosure into ongoing litigation, fairness concerns neither require nor permit massive breaching of the attorney-client privilege.[6] See In re Grand Jury Proceedings, 219 F.3d at 188-89 (finding no broad waiver when disclosure occurred in grand jury testimony and government did not show sufficient prejudice).

Viewed against this backdrop, the district court's turnover order cannot be sustained. Although plotting the precise line that separates judicial disclosures from extrajudicial disclosures sometimes can be difficult, no such difficulties are presented here. The call took place entirely outside the judicial

---

[6]Nothing in this opinion is intended to suggest that extrajudicial disclosures can never work an implied waiver of anything beyond that which actually was disclosed. But such cases will be rare, and the scope of any ensuing waiver will be narrow. See von Bulow, 828 F.2d at 102 n.1. For today, it suffices that the government has neither argued for a narrow waiver nor identified any particular document to which such a waiver might extend. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (explaining that arguments not made in a party's briefs need not be considered).

-16-

context.  The parties to it were co-venturers bent on ironing out wrinkles and reaching a joint business decision.  Given these facts, it would be fanciful to suggest that the disclosures cited by the government were made in anticipation of litigation.

That gets the grease from the goose.  Because the call was plainly extrajudicial, the district court erred in using it as a fulcrum for the implication of a broad subject matter waiver of the attorney-client privilege.  See von Bulow, 828 F.2d at 103; Electro Scientific Indus. v. Gen. Scanning, Inc., 175 F.R.D. 539, 543-44 (N.D. Cal. 1997).

The government argues that even extrajudicial disclosures should be given broad scope when the waiving party seeks later to use that disclosure to its advantage.  We agree in part:  if confidential information is revealed in an extrajudicial context and later reused in a judicial setting, the circumstances of the initial disclosure will not immunize the client against a claim of waiver.  See Electro Scientific, 175 F.R.D. at 544 (explaining that a past extrajudicial disclosure will not cause any prejudice in subsequent litigation as long as the disclosing party "does not try to use [the disclosure] in this litigation"); cf. United States v. Workman, 138 F.3d 1261, 1263-64 (8th Cir. 1998) (finding subject matter waiver after client placed attorney's advice in issue in court case).  The key is that the subsequent disclosure, on its

own, would suffice to waive the privilege.  Here, however, XYZ has not made use of the call in any judicial proceeding.[7]

At the risk of carting coal to Newcastle, we add that a prospective waiver will very rarely be warranted in extrajudicial disclosure cases.  Courts have generally allowed prospective waivers in discrete and limited situations, almost invariably involving advice of counsel defenses.  See, e.g., Minn. Specialty Crops, Inc. v. Minn. Wild Hockey Club, 210 F.R.D. 673, 679 (D. Minn. 2002); Chiron Corp. v. Genentech, Inc., 179 F. Supp. 2d 1182, 1187 (E.D. Cal. 2001).  Every case the government cites in support of the district court's imposition of a prospective waiver involves precisely this scenario.  See Minn. Specialty Crops, 210 F.R.D. at 679 (finding a prospective waiver effected "by the adoption of [an] advice-of-counsel defense"); Chiron Corp., 179 F. Supp. 2d at 1188 (same); Gabriel Capital, L.P. v. Natwest Finance, Inc., No. 99-Civ.-10488, 2001 WL 1132050, at *1 (S.D.N.Y. Sept. 21, 2001) (same); Dunhall Pharms., Inc. v. Discus Dental, Inc., 994 F. Supp. 1202, 1209 n.3 (C.D. Cal. 1998) (finding subject matter waiver throughout the time period of alleged patent infringement when putative infringer asserted advice of counsel defense); see also Glenmede Trust Co. v. Thompson, 56 F.3d 476, 486 (3d Cir. 1995) (finding broad waiver where advice of counsel defense had been

_____

[7]To the extent that the government implies that XYZ used the call in its pre-indictment proffers, that argument fails for the reasons discussed in Part III(B), infra.

-18-

asserted); <u>Abbott Labs.</u> v. <u>Baxter Travenol Labs., Inc.</u>, 676 F. Supp. 831, 832 (N.D. Ill. 1987) (same).

Enforcing a prospective waiver in such a case makes sense: once a litigant puts the legal advice given to him at issue, the opposing party should be entitled to all the information on that same subject regardless of when it was compiled. This ensures that a litigant is not able to present only selected bits of the story and thus distort the truth-seeking process. The case at hand is not one in which an advice of counsel defense has been asserted — indeed, there is no pending proceeding to serve as a vehicle for such a defense — and no such ends would be served by implying a broad prospective waiver.

### B. **Presentations to the Government**.

Our odyssey is not yet finished. Even though the district court did not reach the issue, the government invites us to consider, as an alternative basis on which to uphold the turnover order, its argument that XYZ's pre-indictment proffers waived the attorney-client privilege. <u>See</u> <u>Intergen N.V.</u> v. <u>Grina</u>, 344 F.3d 134, ___ (1st Cir. 2003) [No. 03-1056, slip op. at 13] (explaining that the court of appeals can affirm a judgment on any ground made manifest by the record). The parties have briefed this issue, the facts pertaining to it are essentially uncontradicted, and an adjudication will expedite matters. These factors convince us to accept the government's invitation.

Many years ago, Justice Holmes warned that those who deal with the government must turn square corners. <u>Rock Island, Ark. & La. R.R. Co.</u> v. <u>United States</u>, 254 U.S. 141, 143 (1920). That advice cuts both ways: those who deal with the government have a right to expect fair treatment in return. The principle that the government must turn square corners in dealing with its constituents is dispositive here.

The facts are these. At the time the government filed the motion to compel, it had been engaged in discussions with XYZ for over two years. During that span, the government repeatedly had requested that XYZ waive the attorney-client privilege vis-à-vis communications concerning the device's withdrawal from the market, and XYZ steadfastly had refused. When the government sought permission to audit the tape recording of the call, XYZ agreed on the express condition that leave "was not to be viewed as a waiver of any applicable privilege protecting other communications." The government acceded to this condition.

In February of 2002, government attorneys met with XYZ's outside counsel to discuss the threatened indictment of the corporation and/or its officers. The government acknowledges that it solicited a response from XYZ in hopes of gaining information so that an indictment, if one eventuated, would be based on a fully informed account of the product-withdrawal decision.

-20-

Initially, this solicitation went unheeded. In late April, however, the government wrote to XYZ's outside counsel, formally identifying the corporation as a target of the grand jury investigation. That letter apparently got XYZ's attention. The next month, its counsel responded to the government's earlier request. This epistle, dated May 10, 2002, began with a clear and explicit statement, quoted supra note 3, that nothing contained therein should be deemed a waiver of the attorney-client privilege. The letter set forth various reasons why the government should forgo an indictment. It contained only one glancing mention of an attorney-client communication — a reference to the call (a communication to which the attorney-client privilege never attached). In all events, the government never replied either to this letter or to the privilege reservation contained therein.

The May 10 letter advised the prosecutors that XYZ's counsel would be sending additional material within the next few weeks in order to complete the response that the government had solicited. As promised, XYZ's counsel sent a follow-up letter eleven days later. This missive contained the same privilege reservation (again conspicuously displayed on the first page). In the body of the letter, counsel discussed communications between XYZ and the FDA during September of 1998 (some of which involved Barrister). Once again, the privilege reservation evoked no response.

-21-

Both of counsel's letters referred to an anticipated meeting with the government. That meeting occurred on May 22, 2002. As the first order of business, XYZ's counsel renewed the privilege reservation, stating that any disclosures made during the meeting should not be interpreted as waiving the attorney-client privilege. The government's representatives received this announcement in stony silence. XYZ's presentation proved fruitless and the colloquy between the parties apparently ground to a halt. That was the state of affairs when the government endeavored to subpoena the disputed documents.

The government now claims that these presentations resulted in a waiver of the attorney-client privilege as to the subjects discussed therein. But the circumstances, and particularly the government's own conduct, belie that claim. XYZ was careful to condition each and every disclosure on a clearly stated privilege reservation. The government did not raise the slightest question when these reservations were stated, but, rather, kept the dialogue going and invited additional disclosures. In the circumstances of this case, we think that XYZ reasonably interpreted the government's silence as an acceptance of the reservations. Cf. McGurn v. Bell Microprods., Inc., 284 F.3d 86, 90 (1st Cir. 2002) (stating that silence can serve as acceptance of a condition when the offeree, despite having a reasonable opportunity to reject the condition, takes the benefit of the offer

without saying anything); Restatement (Second) of Contracts §
69(1)(a) (similar).

To be sure, the government now says that XYZ, if it
wanted to guarantee preservation of the attorney-client privilege,
should have secured a written agreement to that effect.  In the
absence of such a step, the government suggests, the unilaterally
imposed privilege reservation was impuissant.  This argument lacks
force.

As we have said, in some cases silence can be the basis
of acceptance.  See, e.g., McGurn, 284 F.3d at 90.  In this case,
the undisputed facts show that the government knew of XYZ's
intention to operate under a privilege reservation from the time
that it first secured a tape recording of the call.  It
unquestionably accepted the reservation at that time.  XYZ then
repeated the reservation on the occasion of each of the three
succeeding pre-indictment presentations (two written and one oral).
The government voiced no objection to the privilege reservation at
any of these times.  Its silence encouraged (indeed, allowed) the
disclosures to go forward.

Here, moreover, the government does not deny that it knew
of the oft-repeated privilege reservations.  Hence, the
government's long delay in raising a claim of waiver is itself an
indication of such knowledge.  See Akamai Techs., Inc. v. Digital
Island, Inc., Nos. 144, 149, 2002 WL 1285126, at *6 (N.D. Cal. May

30, 2002) (finding privilege reservation valid, in part because opposition waited eight months after supposed waiver before seeking to compel production of documents). In turn, the government's ready acceptance of the proffers' benefits, notwithstanding its knowledge of the privilege reservations, makes its current position untenable. Cf. 3 A's Towing Co. v. P & A. Well Serv., Inc., 642 F.2d 756, 758 n.3 (5th Cir. 1981) (finding ratification where delay in repudiating was long and failure to repudiate was "accompanied by acts indicating approval . . . such as receiving and retaining the benefits").

In short, the privilege reservations were not unilaterally imposed, but, rather, were accepted by the government's consistent course of conduct. That course of conduct signaled clearly the government's intention to acquiesce in the privilege reservations. We conclude, therefore, that the reservations were fully effective here. Having lured XYZ into making a series of proffers, the government cannot now be allowed to contradict that reasonable understanding by arguing, after the fact, that it never acceded to the reservations. Cf. United States v. Tierney, 760 F.2d 382, 388 (1st Cir. 1985) ("Having one's cake and eating it, too, is not in fashion in this circuit.").

Although we ground this result in equitable principles, it also comports with sound policy. Arm's-length negotiations between the government and private parties, in advance of an

indictment, aid the truth-seeking process. Such negotiations are to everybody's advantage. They give potential defendants an opportunity to explain away suspicious circumstances, give the government an opportunity to avoid embarrassing and wasteful mistakes, and give the public a greater likelihood of a just result. Requiring the government to turn square corners in such negotiations will make potential defendants more willing to deal with the government in the future. Conversely, refusing to hold the government to such a standard will send a signal to future litigants to negotiate with the government only at their peril. That is not a message that we wish to send — nor is it one that would serve the government's interests.

In a perfect world, of course, XYZ would have secured a written acknowledgment of its privilege reservation in advance of each and every disclosure. But XYZ did secure one such written acknowledgment, and its failure to do so on subsequent occasions is clearly outweighed by two facts: (i) it repeatedly set forth its position, and (ii) the government failed to question the privilege reservation in a timely manner. Under the circumstances of this case, we find that the proffers were made in the course of ongoing plea negotiations; that XYZ explicitly reserved all claims of attorney-client privilege with respect thereto; that the government effectively acquiesced in these reservations; and that the government is bound by them. Consequently, XYZ reserved the

attorney-client privilege by means of its pre-indictment presentations.

## IV. CONCLUSION

We need go no further.[8] We hold that XYZ's extrajudicial disclosure did not give rise, by implication, to a broad subject matter waiver. We further hold that the government's seeming acquiescence in XYZ's privilege reservations precludes any claim that XYZ's pre-indictment presentations worked a waiver of any applicable privilege. Accordingly, we reverse the order appealed from, vacate the contempt citation, and remand to the district court for further proceedings not inconsistent herewith.

**<u>Reversed</u>**.

---

[8]In view of the fact that the attorney-client privilege remains intact, we need not address the work-product doctrine. Nor do we need to reach the government's contention that the inadequate detail on the privilege logs resulted in a waiver. If this is a line of attack that the government wishes to pursue, the district court should consider it in the first instance.